**UNITED STATES of America,**
**Petitioner**

v.

**John Charles VOLUNGUS, Respondent.**

**Civil Action No. 07–12060–GAO.**

United States District Court,
D. Massachusetts.

Feb. 27, 2009.

Jennifer C. Boal, Timothy Q. Feeley, Mark J. Grady, Mark T. Quinlivan, Jennifer A. Serafyn, United States Attorney's Office, Boston, MA, for Petitioner.

William W. Fick, Page Kelley, Judith H. Mizner, Federal Defender's Office, Boston, MA, for Respondent.

## OPINION AND ORDER

O'TOOLE, District Judge.

On his plea of guilty, John Charles Volungus was convicted in 1999 of three federal criminal sex offenses: use of a facility of interstate commerce to attempt to persuade a person under the age of eighteen to engage in a sexual act in violation of 18 U.S.C. § 2422(b); possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(A); and receipt of child pornography through interstate commerce by means of a computer in violation of 18 U.S.C. § 2252(a)(2). He was sentenced to fifty-three months imprisonment, followed by a term of supervised release. His supervised release was later revoked and he was committed to the custody of the Bureau of Prisons for twenty-three months. The latter term of imprisonment expired February 15, 2007. (Notice of Certification that Resp't is a Sexually Dangerous Person & Req. for Hg. Pursuant to 18 U.S.C. § 4248(a) Ex. 1.)

Volungus remains in the custody of the Bureau of Prisons at the Federal Medical Center Devens in Ayer, Massachusetts, because before his projected release date, the United States initiated this proceeding to obtain a determination that he is a "sexually dangerous person" subject to civil commitment for treatment in a suitable facility pursuant to the provisions of 18 U.S.C. §§ 4247 and 4248. Under § 4248(a), the filing of the certificate attached to the government's petition permits Volungus's detention until the issue has been determined. So far as appears, there is no other authority for his continued detention in the custody of the Bureau of Prisons.

Volungus has moved to dismiss the present proceeding on several grounds, each based in a provision of the United States Constitution. It is not necessary to address them all. I agree with Volungus that enactment of the regime for civil commitment of "sexually dangerous persons" does not fall within the scope of the powers granted to Congress by the Constitution and is, therefore, invalid.[1]

---

**1.** This issue has divided district and appellate courts around the country. *Compare United States v. Comstock,* 551 F.3d 274 (4th Cir. 2009), *aff'g* 507 F.Supp.2d 522 (E.D.N.C.

## I. The Statutory Framework

The Adam Walsh Child Protection and Safety Act of 2006 ("the Act") established the Jimmy Ryce Civil Commitment Program, which authorizes the Attorney General or the Director of the Bureau of Prisons ("Director") in certain circumstances to seek the indefinite civil commitment of any person, in federal custody for other reasons, on the ground that the person is a "sexually dangerous person" who is "sexually dangerous to others." *See* Pub. L. No. 109–248, § 302, 120 Stat. 587, 619–22 (codified at 18 U.S.C. §§ 4247, 4248). A "sexually dangerous person" is "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). A person is "sexually dangerous to others" if "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." *Id.* § 4247(a)(6).

The statutory commitment procedure is initiated when the Attorney General or the Director certifies that a person in custody is a "sexually dangerous person" and transmits that certification to the clerk of the district court for the district in which the person is confined. *Id.* § 4248(e). Such a certification stays the release of the person until the commitment process has been concluded. *Id.* Upon receipt of the certification, the district court must conduct a hearing to determine whether the person is indeed a "sexually dangerous person." *Id.* § 4248(c). If the court concludes by clear and convincing evidence

that the person is sexually dangerous as defined, it will order the person committed to the custody of the Attorney General in a "suitable facility" until the State of his domicile or the State where he was tried assumes custodial responsibility. *Id.* § 4248(d). If the relevant State refuses responsibility, the person will remain committed in the custody of the Attorney General. *Id.*

The Act prescribes procedures for an annual review of the determination that the person is "sexually dangerous." *Id.* § 4247(e). The provisions include the possibility of a judicial hearing on the issue. *Id.* § 4248(e). If it is found that the person continues to be sexually dangerous, he remains committed. If it is found that the person will not be sexually dangerous if released, he will be released either unconditionally or subject to a prescribed treatment regimen. *See id.*

These commitment procedures may be applied to three categories of persons: (1) "a person who is in the custody of the Bureau of Prisons," (2) a person "who has been committed to the custody of the Attorney General pursuant to section 4241(d)" (authorizing limited civil commitment of a person found not competent to stand trial), and (3) a person "against whom all criminal charges have been dismissed solely for reasons relating to the mental condition of the person." *Id.* § 4248(a). Volungus apparently falls within the first category, as he is "a person in the custody of the Bureau of Prisons." (*See* Notice of Certification that Resp't is a Sexually Dangerous Person & Req. for Hg. Pursuant to 18 U.S.C. § 4248(a) Ex. 1,

2007), and *United States v. Tom*, 558 F.Supp.2d 931 (D.Minn.2008) (all holding that Congress lacked authority to enact the civil commitment regime), *with United States v. Abregana*, 574 F.Supp.2d 1123 (D.Haw. 2008), *United States v. Dowell*, No. CIV–06–1216–D, 2007 WL 5361304 (W.D.Okla. Dec. 5, 2007), *United States v. Shields*, 522 F.Supp.2d 317 (D.Mass.2007), *and United States v. Carta*, 503 F.Supp.2d 405 (D.Mass. 2007) (all holding that Congress had authority to enact the civil commitment regime).

2.) There is no indication he falls within either of the other two categories.

## II. Civil Commitment and the Powers of Congress

As one ground in support of his motion to dismiss, Volungus argues that the enactment of the civil commitment regime for "sexually dangerous persons" falls outside the scope of the powers granted to Congress by the Constitution. It will benefit the consideration of this argument to recapitulate some familiar first principles.

The Constitution prescribes the national frame of government. Its first three Articles establish the three branches of government, vesting the legislative, executive, and judicial powers respectively in the Congress of the United States, U.S. Const. art. I, § 1, the President of the United States, *id.* art. II, § 1, and the Supreme Court and such inferior courts as Congress may from time to time ordain and establish, *id.* art. III, § 1. Each Article outlines the scope of the powers granted to each respective branch.

Members of the federal bench and bar are surpassingly familiar with the limitations of the powers of the federal judiciary established in Article III. Unless a "case" or "controversy" falls within the authorized jurisdiction of the federal courts, it may not be heard by them. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute."). Observance of those limitations is so thoroughgoing that even a case fully tried must be dismissed as unadjudicated if it later appears that the case falls outside the legitimate jurisdictional power of the federal courts to entertain. *See Mansfield, C & L.M. Ry. Co. v. Swan,* 111 U.S. 379, 383, 4 S.Ct. 510, 28 L.Ed. 462 (1884); *Capron v. Van Noorden,* 6 U.S. (2 Cranch) 126, 127, 2 L.Ed. 229 (1804). Any practical desire to let stand what might be a substantively correct and procedurally fair outcome must yield to an unyielding respect for the limits drawn by the Constitution and jurisdictional statutes. *See Francis v. Goodman,* 81 F.3d 5, 8 (1st Cir.1996) (rejecting the argument that a judgment entered in absence of jurisdiction "should be affirmed in the interests of judicial economy and minimizing litigation costs," because "federal courts are not at liberty to overlook limitations on their subject matter jurisdiction").

■ As with the judiciary, the powers granted to Congress are enumerated and consequently limited, though they are certainly broad.[2] *See* U.S. Const. art. I, § 8. And just as with judicial decisions that fall outside the proper jurisdiction of the federal courts, acts of Congress that fall outside the scope of the powers of Congress have no validity.[3] *See United States v. Morrison,* 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

### A. The Commerce Clause

One of the powers granted to Congress is the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Though once con-

---

**2.** As one commentator has noted, "Article I, § 1 endows Congress not with 'all legislative power,' but only with the 'legislative Powers herein granted.'" Laurence H. Tribe, *American Constitutional Law* 789 (3d ed. 2000).

**3.** The powers of the President, of course, are similarly limited to those granted by the Constitution. *See Youngstown Sheet & Tube Co. v. Sawyer (Steel Seizure),* 343 U.S. 579, 645, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Myers v. United States,* 272 U.S. 52, 123, 128, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

strued rather narrowly and literally, beginning in the 1930s and continuing to the present, the Commerce Clause has generally been given a broad interpretation. *See United States v. Lopez*, 514 U.S. 549, 554–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (tracing the development of the interpretation of the Commerce Clause in the twentieth century). It is now settled that, acting under the authority conferred by the Commerce Clause, there are "three broad categories of activity that Congress may regulate...." *Id.* at 558, 115 S.Ct. 1624.

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Id.* at 558–59, 115 S.Ct. 1624 (internal citation omitted).

 The government does not appear to argue that the Commerce Clause, by itself, would authorize the enactment of the regime for civil commitment of sexually dangerous persons embodied in the Act. Any such argument would be untenable in light of *Morrison* and *Lopez*. Here, as in those cases, the first two categories of permissible regulation under the Commerce Clause are clearly inapplicable. Section 4248 does not regulate the channels or instrumentalities of interstate commerce nor persons or things in interstate commerce. As to the third category of permissible regulation—

activities having a "substantial relation to" or effect upon interstate commerce—here, as in *Morrison* and *Lopez*, what is regulated is non-economic behavior that is not specifically related to interstate commerce, or commerce at all for that matter. *See* 529 U.S. at 613, 120 S.Ct. 1740, 514 U.S. at 561, 115 S.Ct. 1624. Nor is there any "jurisdictional element" that establishes a relationship of the regulated behavior to interstate commerce. *See Morrison*, 529 U.S. at 613, 120 S.Ct. 1740; *Lopez*, 514 U.S. at 562, 115 S.Ct. 1624. In *Lopez*, the Supreme Court rejected the argument that the cumulative effect of the "costs of crime" provided a sufficient relation between local firearm possession and the national economy to justify, under Congress's commerce power, the enactment of the criminal statute at issue there. 514 U.S. at 564, 115 S.Ct. 1624. Similarly, in *Morrison*, the Court rejected a like argument about the cumulative effect of gender-motivated violence on interstate commerce. 529 U.S. at 615, 120 S.Ct. 1740. Any contention that the cumulative effects of sexually dangerous acts would justify the commitment regime under the Commerce Clause lacks merit in light of these cases.[4]

"The Constitution requires a distinction between what is truly national and what is truly local." *Id.* at 617–18, 120 S.Ct. 1740 (citing *Lopez*, 514 U.S. at 568, 115 S.Ct. 1624). The "suppression of violent crime and vindication of its victims" is squarely within the general police power, "which the Founders denied the National Government and reposed in the States." *Id.* at 618, 120 S.Ct. 1740. Similarly, the States have traditionally been responsible, acting either as *parens patriae* or under the general police power, for measures providing for the care and custody of mentally ill per-

---

**4.** On the other hand, sexually dangerous behavior that employs the channels or instrumentalities of interstate commerce, or that involves interstate activities, may be regulated and criminalized. *See infra* p. 9.

sons, including measures protecting the public from harms that might be committed by such persons. *See United States v. Comstock*, 551 F.3d 274, 278 (4th Cir.2009) ("In the exercise of their general police and *parens patriae* powers, the states have long controlled the civil commitment of the mentally ill."); *United States v. Cohen*, 733 F.2d 128, 137 n. 15 (D.C.Cir.1984) ("[L]egislative authority in the general field of lunacy is reserved to the states."); S.Rep. No. 98–225, at 250 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3432 ("[T]he responsibility for the care of insane persons is essentially a function of the States."); Note, *Federal Hospitalization of Insane Defendants Under Section 4246 of the Criminal Code*, 64 Yale L.J. 1070, 1070 (1955) ("Power over the general field of insanity resides exclusively in the states as *parens patriae* ...."). Protecting the public from harmful acts by persons who are sexually dangerous by reason of "a serious mental illness, abnormality, or disorder," 18 U.S.C. § 4247(a)(6), is no different from protecting the public from harmful acts by persons who are dangerous to others in other ways by reason of mental illness. Providing for such protection is primarily the responsibility of the States.[5] For federal legislation in the area to be authorized under the Commerce Clause, there must be more than some remote,

potential, cumulative effect on commerce. *See Morrison*, 529 U.S. at 615, 120 S.Ct. 1740.

*B. The Necessary and Proper Clause*

■ In addition to the authority conferred by the enumerated powers standing alone, the Constitution also authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution" the specifically enumerated powers, including the power granted by the Commerce Clause. U.S. Const. art. I, § 8, cl. 18. This Necessary and Proper Clause grants to Congress the power to determine the appropriate means by which it exercises its enumerated powers. *See, e.g., United States v. Darby*, 312 U.S. 100, 118, 61 S.Ct. 451, 85 L.Ed. 609 (1941); *The Legal Tender Cases*, 110 U.S. 421, 440–41, 4 S.Ct. 122, 28 L.Ed. 204 (1884); *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

One such means is the enactment of criminal laws. While the Constitution only explicitly empowers Congress to punish certain particular offenses, *see* U.S. Const. art. I, § 8, cls. 6, 10, there is no doubt that Congress may proscribe and punish criminal activity wherever doing so advances the execution of any of its enumerated powers. *See Logan v. United States*, 144

---

**5.** States have acted to provide for the civil commitment of sexually dangerous persons. *See* Ariz.Rev.Stat. Ann. §§ 36–3701 to –3717; Cal. Welf. & Inst.Code §§ 6600–6609.3; Fla. Stat. §§ 394.910–.932; 725 Ill. Comp. Stat. §§ 207/1–/99; Iowa Code §§ 229A.1–.16; Kans.Crim.Code Ann. §§ 59–29a01 to a22; Mass. Gen. Laws ch. 123A, §§ 1–16; Minn. Stat. § 253B.185; Mo.Rev.Stat. §§ 632.480–.513; N.H.Rev.Stat. Ann. 135–E:1 to :23; Neb. Rev. Stat §§ 71–1201 to –1226; N.J. Stat. Ann. §§ 30:4–27.24 to .37; N.Y. Mental Hyg. Law §§ 10.01–.17; N.D. Cent.Code §§ 25–03.3–01 to –24; 42 Pa. Cons.Stat. Ann. §§ 6401–6409; S.C.Code Ann. §§ 44–48–100 to –170; Tex. Health & Safety Code Ann.

§§ 841.001–.150; Va.Code Ann. § 37.2–900 to –920; Wash. Rev.Code §§ 71.09.010–.902; Wis. Stat. § 980.01–.14; *see also Kansas v. Hendricks*, 521 U.S. 346, 357, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (upholding Kansas's Sexually Violent Predator Act and stating: "States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety. We have consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards.") (internal citation omitted).

U.S. 263, 283, 12 S.Ct. 617, 36 L.Ed. 429 (1892). This is true, of course, with respect to Congress's power to regulate interstate commerce. *See Darby,* 312 U.S. at 125–26, 61 S.Ct. 451. And indeed, Title 18 of the United States Code is chock full of criminal statutes furthering the authorized regulation of interstate commerce, including statutes punishing various sex offenses defined to include a sufficient nexus to interstate commerce. *See generally* 18 U.S.C. §§ 2251–2260A ("Sexual Exploitation and Other Abuse of Children"); *id.* §§ 2421–2440 ("Transportation for Illegal Sexual Activity and Other Crimes").

Congress may also deem it "necessary and proper" to provide for the civil commitment of persons in certain circumstances adjunct to the enforcement of federal criminal laws, and it has done so in Chapter 313 of Title 18 of the United States Code ("Offenders with Mental Disease or Defect"). A person found not guilty of a federal crime only by reason of his insanity may be committed to a "suitable facility" for his "custody, care, and treatment." *Id.* § 4243(a), (e). A person convicted of a federal crime and found to be "suffering from a mental disease or defect for the treatment of which he is in need of custody or care or treatment in a suitable facility" may be hospitalized rather than imprisoned. *Id.* § 4244(a); *see also id.* § 4245(a) (authorizing the transfer of a person serving a sentence of imprisonment who is "suffering from a mental disease or defect" to a "suitable facility for care or treatment"). A person charged or to be charged with a federal crime who is "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense" may also be committed for a limited time, until he either recovers sufficiently to be tried or is hospitalized for further treatment. *Id.* §§ 4241, 4246.

Both the utility of these civil commitment provisions and their adjective relationship to the enforcement of the federal criminal laws are readily apparent. A person who is not guilty only by reason of insanity would, if not for the insanity, be guilty and liable to commitment under a term of imprisonment. Substituting a therapeutic commitment for a punitive one is a policy choice that is clearly within Congress's power to make. Similarly, a guilty person sentenced to a term of imprisonment may be alternately transferred from punitive custody to a "suitable facility" for treatment. With regard to a person charged with a federal offense who is not mentally competent to be tried, the federal interest in prosecution may be suspended, but not necessarily terminated. Committing such a person to custody for diagnosis and treatment in the expectation or hope that he may recover and the prosecution may proceed is a rational and valid measure supporting the federal criminal process.

In *Greenwood v. United States,* 350 U.S. 366, 375, 76 S.Ct. 410, 100 L.Ed. 412 (1956), the Supreme Court considered statutory provisions concerning the commitment of persons found incompetent to stand trial that were the precursors of the present § § 4241 and 4246 and were similar in substance to the present versions. Greenwood had been indicted for robbery of a United States Post Office and felonious assault on a postal employee. *Id.* at 369, 76 S.Ct. 410. After an initial evaluation found him not competent to stand trial, Greenwood was committed to the custody of the Attorney General

> until his sanity should be restored, or his mental condition so improved that, if released, he would not endanger the safety of the officers, property, or other

interests of the United States, or until suitable arrangements could be made for the custody and care of defendant by Ohio, the State of his residence.

*Id.* at 372, 76 S.Ct. 410. The three conditions recited were statutory conditions upon which a person committed for incompetence to stand trial might be released. *See id.* at 367 n. 1, 368 nn. 2, 3, 369 n. 4, 76 S.Ct. 410.

In its antecedent decision in the case, the Eighth Circuit had summarized the question presented this way:

> It is safe to say that the validity and effectiveness of the statutory provisions which are under attack are not subject to question in so far as they provide for the commitment to the custody of the Attorney General of one charged with a federal offense whose mental incompetency to stand trial is temporary.... The controversial question is whether Congress has the power to provide for the care and custody of a mentally incompetent accused whose incompetency to stand trial is or may be permanent or of indefinite duration.

*Greenwood v. United States,* 219 F.2d 376, 386 (8th Cir.1955). The Eighth Circuit answered that question affirmatively.[6] *Id.* at 387.

Reaching what it called "the narrow constitutional issue raised by the order of commitment in the circumstances of this case," the Supreme Court concluded that Congress had the power under the Necessary and Proper Clause to authorize the commitment of an incompetent accused to the custody of the Attorney General until he had recovered or until his release would not likely "endanger the officers, property, or other interests of the United States." *Greenwood,* 350 U.S. at 375, 76 S.Ct. 410. Even though commitment might be of indefinite duration, it was nonetheless within the scope of legitimate congressional power because prosecution for the federal offense was still possible.[7] *Id.* ("We cannot say that federal authority to prosecute has now been irretrievably frustrated."). In other words, the power to authorize potentially indefinite commitment of an incompetent accused served the undeniably legitimate interest of enforcing federal criminal statutes.

The fact that the "power to prosecute [Greenwood] for federal offenses" had not been "exhausted" nor "irretrievably frustrated" formed the basis for the Court's judgment that the provision for commitment fell within the scope of congressional power under the Necessary and Proper Clause. *See id.* The relevant sources of congressional power may be traced as follows: The Constitution expressly grants Congress the power "[t]o establish Post Offices and post Roads." U.S. Const. art. I, § 8, cl. 7. It also expressly grants Congress the power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *Id.* art. IV, § 3. Under these grants, augmented by the Necessary and Proper Clause, Congress may enact and

---

6. The Ninth and Tenth Circuits previously expressed in dicta an opposite conclusion. *See Higgins v. United States,* 205 F.2d 650, 653 (9th Cir.1953); *Wells v. Att'y Gen.,* 201 F.2d 556, 560 (10th Cir.1953).

7. The Court noted, "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." *Greenwood,* 350 U.S. at 375, 76 S.Ct. 410. Indeed, the case record reflected a difference of opinion among examining psychiatrists as to the temporary or permanent nature of Greenwood's incapacity. Emphasizing the narrowness of the ruling, the Court cautioned, "We decide no more than the situation before us presents and equally do not imply an opinion on situations not now before us." *Id.* at 376, 76 S.Ct. 410.

enforce criminal statutes protecting post offices and postal employees. Further, Congress may provide for civil commitment of incompetent persons accused under those federal criminal laws so long as the prospect of prosecution of such persons remains possible.[8]

*Greenwood,* however, does not answer the question presented in this case. Because Congress may, within the proper scope of its powers, provide for the civil commitment of persons in *some* circumstances does not mean it may do so in *any* circumstances. The persons vulnerable to commitment under the regime are not persons, like Greenwood, as to whom there are untried federal charges that might yet be prosecuted.[9] Nor would commitment under the civil commitment regime vindicate the outcome of a completed federal trial, as with persons found not guilty only by reason of insanity. Rather, the commitment regime authorizes the detention of persons not on the basis of their past conduct in relation to legitimate federal interests, but rather on the prospect of future conduct that may or may not affect legitimate federal interests. And it does so in aid of general public safety, not in pursuance of a specifically federal interest.

The commitment regime does not require a determination that a legitimate federal interest would be threatened in

order to find a person "sexually dangerous" and, thus, subject to commitment. *Compare Greenwood,* 350 U.S. at 372, 76 S.Ct. 410 (noting that a person would remain committed until he would "not endanger the safety of the officers, property, or other interests of the United States"). For example, there is no requirement that the sexual dangerousness take the form of a likely violation of a federal criminal statute. In fact, the commitment regime does not explicitly require a determination that a person is likely to violate *any* criminal statute in order to be found "sexually dangerous," although the reference to "sexually violent conduct or child molestation" in the definition of "sexually dangerous to others" may generally imply the commission of a criminal offense. *See* 18 U.S.C. § 4247(a)(6). But whether an hypothesized offense would be a federal or state offense does not affect eligibility for commitment.

So the question comes down to this: Does the Necessary and Proper Clause grant Congress the power to authorize the civil commitment of persons who are likely to act in a way that could possibly transgress federal criminal statutes that have been enacted in the legitimate exercise of congressional power to regulate interstate commerce?[10] As the question itself sug-

---

**8.** *But see Jackson v. Indiana,* 406 U.S. 715, 732–33, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (expressing doubt whether the statutes at issue in *Greenwood* "could survive constitutional scrutiny if interpreted to authorize indefinite commitment").

**9.** Section 4248(a) authorizes commitment of a person who "has been committed to the custody of the Attorney General pursuant to section 4241(d)." Before the 2006 passage of the Act, such a person was subject to commitment under §§ 4241(d) and 4246, validated by *Greenwood,* because an actual federal prosecution could not be completed by reason of the person's incompetency. That remains

true. The Act authorizes such a person to be held not because of the federal interest in the prosecution of a past offense, but because of the possibility of an as yet uncommitted future offense. In that respect, the interests of a person committed under § 4241(d) are the same as the interests of a person in either of the other two categories of potential civil committees identified in § 4248(a) as those interests pertain to potential commitment as a "sexually dangerous person."

**10.** It should be noted that this is a different question from whether civil commitment of persons who may, in the future, commit a federal offense comports with the Fifth

gests, the problem is in large part one of attenuation, just as it was in *Lopez* and *Morrison.*[11] How many degrees of separation are permitted between the constitutional end to be achieved (i.e., regulation of interstate commerce) and the means enacted purportedly to serve that end (i.e., civil commitment of potential bad actors, whose bad acts might violate federal criminal statutes enacted by Congress under the authority of the Commerce Clause)?

■ In providing for the effective enforcement of federal criminal laws, Congress undoubtedly has the power not only to prosecute crimes after they have been committed, but also to take certain steps to prevent the commission of future crimes. But those measures must always be connected to a legitimate federal interest and there is always a question of degree.[12] *See Lopez,* 514 U.S. at 566, 115 S.Ct. 1624 (citing *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57

S.Ct. 615, 81 L.Ed. 893 (1937)). The more indirect the support a particular measure may give to the exercise of an enumerated power, the less it can be said it is "necessary and proper" to that exercise. The Supreme Court in *Lopez* counseled against piling "inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567, 115 S.Ct. 1624. The same is certainly true of the instrumental authority granted to Congress under the Necessary and Proper Clause.

In sum, the Act's regime for the civil commitment of sexually dangerous persons offers only remote and contingent support for the regulation of interstate commerce. It encroaches on an area of lawmaking that has historically been, and is today, a matter of the exercise by the States of their general police powers. These two

---

Amendment's guarantee of due process. That question is not reached here.

11. In *Morrison,* the Court observed:
[T]he concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded. *See Lopez,* [514 U.S.] at 564, 115 S.Ct. 1624. The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.
529 U.S. at 615, 120 S.Ct. 1740.

12. Bright lines are not always serviceable in answering constitutional questions. Often the constitutionality of a statute turns on questions of degree. *See, e.g., Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 877–78, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (stating that an "undue burden" on the choice whether to have an abortion exists if the state regulation places "a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus"); *Lynch v. Donnelly,* 465 U.S. 668, 684, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (explaining that under the First Amendment's Establishment Clause, "entanglement is question of kind and degree."); *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (noting that "this Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government" under the Takings Clause of the Fifth Amendment).

facts combine to lead to the conclusion that § 4248 does not fall within the proper scope of congressional power conferred by the Necessary and Proper Clause as a means to exercise congressional authority granted under the Commerce Clause.

### III. Other Issues

■ Two more points need to be made. First, there is some intimation in the government's argument that the civil commitment regime is within congressional power because it pertains only to a person already in the custody of either the Attorney General or the Bureau of Prisons. That is, it may be suggested that the very fact of his federal custodial status gives Congress the power to enact a new basis for keeping him confined. There is no doubt that Congress may enact provisions relating to the conditions under which a person in lawful custody is confined. The commitment regime, however, does not simply regulate conditions of confinement, but rather provides an alternate basis for confinement distinct from the basis under which the person came first into custody. The government does not achieve plenary jurisdiction over a person in its custody just by reason of that custody. The notion is a *non sequitur*.

Moreover, to the extent this proposition is suggested as a basis for the power to commit, it is at odds with the government's principal argument that the power to commit derives from its interest in preventing future violations of federal criminal law. The interest in preventing future crimes, if it were a valid basis for congressional power in this instance, would justify the detention of any person who met the statutory definition of "sexually dangerous person," whether presently confined in federal custody or not. While under the present iteration of the commitment regime, only those in certain categories of custody are eligible to be committed, neither the described standard for commitment nor the argument in favor of its constitutionality depends on the fact of present custody. Custody provides only the occasion for the commitment, not its justification.

Finally, the government argues that Volungus's attack on the civil commitment regime is an improper "facial challenge." It invokes the often-quoted statement regarding facial challenges from *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987): "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." This statement has been criticized. *See, e.g., City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion) (noting that "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself"); *Washington v. Glucksberg*, 521 U.S. 702, 740, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in the judgments) (stating that the Court has never in fact employed "such a strict standard"). In any event, the First Circuit continues to apply it. *See, e.g., Dutil v. Murphy*, 550 F.3d 154, 160 (1st Cir.2008); *Cook v. Gates*, 528 F.3d 42, 56 (1st Cir.2008); *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 12 (1st Cir.2005) (*abrogated on other grounds by Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007)); *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 77 (1st. Cir. 2001).

Nonetheless, it is doubtful that the *Salerno* standard applies in this case. All of

the cases cited in the preceding paragraph involved claims that the enforcement of a statute would infringe the constitutional rights of persons subject to that statute, commonly claims founded in the Due Process Clause of the Fifth Amendment or the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *See Morales,* 527 U.S. at 50, 119 S.Ct. 1849 (challenging a gang loitering ordinance as unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment); *Glucksberg,* 521 U.S. at 705–06, 117 S.Ct. 2258 (asserting that the State's ban on assisted suicide violated the Due Process Clause of the Fourteenth Amendment); *Dutil,* 550 F.3d at 159–60 (alleging that the Massachusetts Sexually Dangerous Person statute violated due process by failing to specify a deadline for redetermination hearings); *Cook,* 528 F.3d at 45 (claiming that "Don't Ask, Don't Tell" violated the due process and equal protection components of the Fifth Amendment and the Free Speech Clause of the First Amendment); *Comfort,* 418 F.3d at 6 (contending that a school district's noncompetitive transfer plan violated the Equal Protection Clause of the Fourteenth Amendment); *see also Pharm. Research & Mfrs. of Am.,* 249 F.3d at 71 (questioning whether the Act to Establish Fairer Pricing for Prescription Drugs violated the dormant Commerce Clause).

At issue in those cases were the *effects* of the law's enforcement upon the persons claiming to be aggrieved. In each case, the question presented was: Would the enforcement of the law result in a deprivation of a constitutional right? If a tentative answer was, "Plausibly so," then the next question became, "Always? Or just in some cases?" Thus, the distinction in such cases between a "facial" challenge—the statute *always* has an unconstitutional effect—and an "as-applied" challenge—the statute *sometimes* has an unconstitutional effect, depending on the facts of the case—becomes a meaningful one. But for purposes of the claim considered here, Volungus's attack is not concerned with the effects of the application of the civil commitment regime. It is, rather, a claim that the enactment of the regime was *ultra vires* and therefore that *all effects* are impermissible because Congress lacked power to adopt the regime in the first place. It is noteworthy that the issue of a "facial" *versus* an "as-applied" challenge is entirely absent from the Court's lengthy opinions in both *Morrison* and *Lopez,* which suggests the question is not germane to a claim of statutory invalidity on the ground that the enactment exceeded Congress's legitimate constitutional powers. *See Sabri v. United States,* 541 U.S. 600, 610, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (Kennedy, J., concurring in part).

In any event, should the "facial"/"as-applied" dichotomy matter here, Volungus's challenge qualifies as a facial challenge. There are three categories of persons susceptible to commitment under § 4248. Two categories involve persons as to whom there is no pending or prospective federal prosecution which the commitment as a "sexually dangerous person" might support or further. *See* 18 U.S.C. § 4248(a) (proceedings may be instituted against "a person who is in the custody of the Bureau of Prisons" and persons "against whom all criminal charges have been dismissed solely for reasons relating to the mental condition of the person"). The government, relying on *Greenwood,* argues that the remaining category—a person "who has been committed to the custody of the Attorney General pursuant to section 4241(d)" as incompetent to stand trial—is one to which the sexually dangerous commitment procedures can be applied. *See id.* As discussed above, *Greenwood*'s holding does not stretch that far.

*See supra* pp. 74–76 and note 7. A person who has been temporarily committed as incompetent to stand trial may be retained in custody under the conditions set forth in § 4246. That was true before the enactment of § 4248, and it remains true afterwards. It was that statutory scheme which the *Greenwood* Court approved so long as the prospect of a federal prosecution was not "exhausted" or "irretrievably frustrated." *See* 350 U.S. at 375, 76 S.Ct. 410.

The Act added a new, additional ground for holding such a person in custody— namely, that the person is "sexually dangerous." With regard to the prospect of commitment under § 4248, a person temporarily in the custody of the Attorney General under § 4241(d) is in exactly the same position as a person in custody whose charges have been dismissed or a person in the custody of the Bureau of Prisons. Persons in each category are made susceptible to civil commitment by reason of predictions (or fears) about their future behavior, not by reason of whatever prior event has led to their predicate custodial status. *See supra* note 9. The reasoning set forth above concerning the claim that Congress lacks power to provide for the prospective civil commitment of sexually dangerous persons applies equally to person in all three categories. That is to say, it applies to all cases that could be reached under § 4248(a), and thus the *Salerno* standard is met, if it applies.

## IV. *Conclusion*

Congress lacked power to adopt the Act's regime for the civil commitment of sexually dangerous persons either under the Commerce Clause directly or as its authority over interstate commerce is supplemented by the Necessary and Proper Clause. The civil commitment regime for sexually dangerous persons set forth in 18 U.S.C. §§ 4247, 4248 is void and unenforceable. Accordingly, the respondent's motion to dismiss the petition for commitment (dkt. no. 6) is GRANTED. Unless some other valid basis permits Volungus's continued incarceration beyond the expiration of his term of imprisonment, he is to be released forthwith.

It is SO ORDERED.