**UNITED STATES OF AMERICA, Plaintiff**

**v.**

**LOUIS MILTON WILLIS, Defendant**

Criminal No. 2014-28

District Court of the Virgin Islands

St. Thomas and St. John Division

June 15, 2015

758

JENNIFER LEIGH BLACKWELL, ESQ., PETER MASON, ESQ., JASON D. WEITZ, ESQ., United States Department of Justice, Criminal Division, RONALD SHARPE, United States Attorney, DELIA SMITH, United States Attorney's Office, St. Thomas, USVI, *For the United States of America.*

DANIEL LOUIS CEVALLOS, ESQ., Cevallos & Wong, LLP, Philadelphia, PA, *For Louis Milton Willis., Defendant.*

GÓMEZ, *District Judge*

## MEMORANDUM OPINION

(June 15, 2015)

Before the Court is the motion of defendant Louis Willis, as supplemented, for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33.

## I. FACTUAL AND PROCEDURAL HISTORY

Louis Milton Willis ("Willis") was the Executive Director for the Twenty-Eighth Legislature of the Virgin Islands (the "Legislature"). He was in that position from 2009 through 2011. While serving as the Executive Director of the Legislature, Willis was involved in securing contractors to perform renovations to the Legislature building. Three contractors — Wilson John Marie ("Marie") (Contractor C), Frank James ("James") (Contractor B), and Alwin Williams, Sr. ("Williams") (Contractor A) — were among those hired by Willis to assist in renovating the Legislature. Marie, James, and Williams all gave cash or other items of value to Willis during their contracts, allegedly for the purpose of securing more government work or ensuring payment of their invoices during the renovation.

Willis was indicted on May 8, 2014. Counts One, Three, and Five charged Willis with federal programs bribery, in violation of Title 18, Section 666 of the United States Code ("Section 666"). Counts Two, Four, and Six charged Willis with extortion under color of official right, in violation of Title 18, Section 1951 of the United States Code (the "Hobbs Act").

The case went to trial on November 17, 2014. At trial, the government introduced the testimony of the three contractors regarding their contacts with Willis. The contractors each also testified as to what they had provided to Willis in the form of either cash or other items and services. The government also introduced the testimony of several government employees from the Virgin Islands Bureau of Internal Revenue ("VIBIR"), the Legislature, the Office of Management and Budget ("OMB"), and the Virgin Islands Inspector General's Office ("OIG").

Marie was the first contractor to testify. Marie stated that he was a carpenter in the United States Virgin Islands. He testified that he had done work for a renovation of the Legislature during the years 2010 and 2011. Marie stated that Willis drafted a contract for that work. Marie further testified that the hours he submitted would be reviewed and approved by Willis, who would then sign the invoice. Once the invoice was signed, Marie stated he would be paid by the Legislature's business office.

Marie testified that he would then give some of the monies he had been paid to Willis. When asked about the payment to Willis, Marie stated that it was "[t]o keep the job going, keep [Marie] going for the job." (Nov. 17,

2014, Trial Tr. 148:20.) When asked how much money he had given to Willis, Marie said it was "around, around three times, about $5,000." (Id. 148:22-23.) Marie further stated that Willis had instructed Marie to hire a relative of one of Willis's coworkers, and that Marie had done so.

James was the second contractor to testify. He stated that he owned a business specializing in air conditioning installation, maintenance, and repair. James testified that he performed work on the Legislature building during the renovation. During the renovation, James's contact in the Legislature was Willis. James testified that at various points, Willis asked James for: $1,000, to evaluate Willis's home air conditioning, and for $10,000. James stated that he did not pay Willis when first asked for $1,000. James testified that he did go to Willis's home, looked at the air conditioning units, and replaced an air conditioner there without charging Willis for the unit or for the installation. Finally, James testified that he wrote a check for $10,000 to a paving company to assist Willis. When asked why he wrote the check to the paving company rather than to Willis himself, James said that Willis told James that Willis needed the money to pave Willis's driveway. James testified that the $10,000 check was a loan to Willis. When asked about loan terms or interest, James said that there were no terms for repayment or interest. James testified that, to date, the funds had not been repaid.

The final contractor to testify was Williams. Williams stated that he owned a company that did excavation and demolition. Williams testified that while he was at the Legislature, speaking with Willis, that Willis mentioned having money problems. Thereafter, Williams gave Willis $3,000 in cash. Williams stated that he gave Willis the money in order to ensure Willis would "look out for [Williams] down the road." (Nov. 18, 2014, Trial Tr. 71:20-21.) Specifically, Williams hoped that Willis would consider using Williams's company for future work. (Id. 71:23-24.)

Michael Benjamin ("Benjamin"), acting business director for the Legislature, testified about Willis's role as the Executive Director at the Legislature. Benjamin stated that the Executive Director was tasked with general oversight of the operation, including anything that had to do with contracts. According to Benjamin, the Executive Director answered solely to the President of the Legislature. As business director, Benjamin paid invoices on behalf of the Legislature. Funds used for the payment of contractors were appropriated for the Legislature and came from the Government of the Virgin Islands' treasury. Benjamin stated that the

Government of the Virgin Islands' funds included federal funds. Finally, Benjamin testified regarding the Executive Director's authority to go out and solicit and accept contracts on behalf of the Legislature. Benjamin said that such contracts bound the Legislature. Benjamin stated that the contracts entered by the Executive Director did not require approval from the Legislature in order to be valid.

Following the introduction of testimony from each of the government's witnesses, the government rested.

Thereafter, Willis moved for a judgment of acquittal. The Court denied the motion. Willis then presented his defense, calling a number of witnesses. Following the conclusion of Willis's case-in-chief, Willis again moved for a judgment of acquittal. The Court denied the renewed motion.

On November 19, 2014, the jury returned a verdict finding Willis guilty of Counts One, Two, Three, and Four. Willis was acquitted as to Counts Five and Six.

Thereafter, Willis filed a motion for judgment of acquittal or, in the alternative, for a new trial. Willis asserts several legal arguments for why the government has failed prove his guilt under either Section 666 or the Hobbs Act. In the alternative, he asserts that certain alleged errors that occurred at trial entitle him to a new trial. The government opposes Willis's motion.

## II. DISCUSSION

### A. Rule 29 — Motion for a Judgment of Acquittal

■ A judgment of acquittal is appropriate under Rule 29 if, after reviewing the record in a light most favorable to the prosecution, the Court determines that no rational jury could find proof of guilt beyond a reasonable doubt. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006); *see also United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (district court must " 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.' ") (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).

■ An insufficiency finding should be " 'confined to cases where the prosecution's failure is clear.' " *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). "Courts must be ever

vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted); *see also United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984) ("Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the fact finders was permissible.").

■ The government may sustain its burden entirely through circumstantial evidence. *Bobb*, 471 F.3d at 494; *see also United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988). A motion for acquittal should be granted when there is a "total absence of evidence that [the] defendant had any connection" with the crimes alleged and proved. *United States v. Darrell*, 629 F.2d 1089, 1091 (5th Cir. 1980) (conviction reversed with directions to enter judgment of acquittal in mail fraud case, noting there was little Fifth Circuit precedent saying what evidence would permit an inference of the defendant's identity).

## B. Rule 33 — Motion for a New Trial

■ When deciding a Rule 33 motion for a new trial, the Court is provided somewhat more discretion than what is afforded under Rule 29. Under Rule 33, the Court may grant a new trial "in the interest of justice." *United States v. Charles*, 949 F. Supp. 365, 368, 35 V.I. 306 (D.V.I. 1996). In assessing such "interest", the court may weigh the evidence and credibility of witnesses. *United States v. Bevans*, 728 F. Supp. 340, 343 (E.D. Pa. 1990), *aff'd*, 914 F.2d 244 (3d Cir. 1990). If the Court determines that there has been a miscarriage of justice, the court may order a new trial. *Id.* "The burden is on the defendant to show that a new trial ought to be granted. Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Clovis*, Crim. No. 94-11, 1996 U.S. Dist. LEXIS 20808, at *5 (D.V.I. Feb. 12, 1996).

■ A defendant is required to show there is newly discovered evidence or that there was reversible error at his trial in order to be granted a new trial pursuant to Federal Rule of Criminal Procedure 33. "[A] district court 'can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred — that is, that an

innocent person has been convicted.' " *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).

## III. ANALYSIS

### A. Rule 29

■ Willis has filed a post-trial motion, and a supplement thereto, for a judgment of acquittal pursuant to Rule 29 on Counts One, Two, Three, and Four. A judgment of acquittal is appropriate under Rule 29 if, after reviewing the record in a light most favorable to the prosecution, the Court determines that no rational jury could find proof of guilt beyond a reasonable doubt. *Bobb*, 471 F.3d at 494. The Government's burden to show proof beyond reasonable doubt must be met as to each element of the alleged crimes. *See In re Winship*, 397 U.S. 358, 361-62, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

### 1. Counts One and Three: Federal Programs Bribery

■ The essential elements that the government must satisfy for Section 666, federal programs bribery are: (1) that the defendant was an agent of a state government or a state governmental agency; (2) that the defendant corruptly solicited or accepted something of value with the intent to be influenced or rewarded in connection with the business of the state or state agency; (3) that the defendant accepted something of value in connection with the business or transactions of the state involving anything of value of $5,000 or more; (4) that the state received in excess of $10,000 in federal funds in any single year; and (5) that the defendant acted willfully and knowingly. See 18 U.S.C. § 666; *see also United States v. Foley*, 851 F. Supp. 507, 509 (D. Conn. 1994).

With regard to the first element, Willis argues that he was not an agent of the Government of the Virgin Islands (as alleged in the Indictment) or of the executive branch of the Government of the Virgin Islands. Willis asserts that he was an agent solely of the Legislature.

Section 666 defines the word "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative[.]" 18 U.S.C. § 666(d)(1). Willis, as the Executive Director of the Legislature was

empowered to bind the Legislature to contracts. No permission or approval had to be sought from the President of the Legislature or the Senators themselves. Willis could thereby single-handedly enter contracts on the Legislature's behalf. The issue is whether this ability to act for the Legislature constitutes acting for the Government of the Virgin Islands itself.

■ The Government of the Virgin Islands in its current form was created by the Revised Organic Act of 1957. *See generally* 48 U.S.C. §§ 1541 et seq. (the "Revised Organic Act"). "The [Revised] Organic Act of the Virgin Islands created three branches of government in the Virgin Islands. *See* 48 U.S.C. § 1571 (legislative branch); *id.* § 1591 (executive branch); *id.* § 1611 (judicial branch)." *Smith v. Magras*, 124 F.3d 457, 465, 37 V.I. 464 (3d Cir. 1997). The Legislature, which is one of the three coordinate branches, is a constituent part of the Government. *See, e.g., United States v. Fernandez*, 722 F.3d 1, 9 (1st Cir. 2013) ("The Puerto Rico Senate is a constituent part of the Commonwealth government, created by the Puerto Rico Constitution.")

■ All funds of the Government of the Virgin Islands are held within the Virgin Islands Department of Finance ("Finance"). See V.I. CODE ANN. tit. 3, § 177(a)(3) ("The Department [of Finance] shall exercise general control over the enforcement of the laws relating to finance, and shall . . . provide for a depository of all public funds[.]") Though the government's funds are retained in Finance, Finance has no authority to appropriate those funds. Indeed, only the Legislature has the authority to appropriate government monies. See V.I. CODE ANN. tit. 33, § 3101 (prohibiting expenditures in excess of legislative appropriations). When appropriating funds, distributing them to agencies, other branches of Government, or to the Legislature's coffers themselves, the Legislature thereby acts as a constituent part of the Government of the Virgin Islands.

Because the Legislature is an integral part of a three-branch system, it would be error to categorize it as simply another government agency. Indeed, as this Court has previously stated

> [t]here can be but one Government of the Virgin Islands. It is com-
> prised of three separate and coequal branches — the Executive, Leg-
> islative, and Judiciary. Much like the branches of a tree, neither of
> these branches can truly exist without the other. To contend otherwise
> leads to the absurd result that the Virgin Islands, unlike the United

766

States, or any state therein, or indeed any country, province, or territory of which this Court is aware, is governed by three governments. The complexities and paradoxes of such a bizarre arrangement [are] difficult to fathom. Yet, this view — one in which it is impossible to sue a sovereign entity as a whole; one in which every component branch, agency, and perhaps even each and every person which compose a Government must be sued individually and separately — is urged on this Court today. The Court declines to adopt such a view.

*Kendall v. Superior Court, Gov't of the Virgin Islands*, Civ. No. 2010-109, 2013 WL 785518, at *6 (D.V.I. Mar. 1, 2013) *aff'd sub nom. Kendall v. Gov't of Virgin Islands*, 596 Fed. Appx. 150 (3d Cir. 2015).

Despite the integral nature of the Legislature's position within the Government of the Virgin Islands, Willis argues that he was an agent solely of the Legislature and not the Government in total. He is not the first defendant to make such an argument.

In *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013), the United States Court of Appeals for the First Circuit was faced with a similar argument. The defendants in Fernandez consisted of a senator in the Senate of the Commonwealth of Puerto Rico and a contractor. *Fernandez*, 722 F.3d at 6. The defendants argued that a senator was not an "agent" within the meaning of Section 666 and, if he was an agent, that he was an agent of the Puerto Rico Senate and not an agent of the Commonwealth of Puerto Rico. *Id.* at 8-10. After rejecting the view that senators could not be "agents" within the meaning of Section 666, the First Circuit stated

> Once again we need go no further than the plain language of the statute to conclude that Martínez and de Castro Font may be properly considered "agents" of the Commonwealth of Puerto Rico. Among the five types of entities for which one may be an agent within the meaning of § 666 is a state government. See 18 U.S.C. § 666(a)(1), (2) (referring to "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof"). The Puerto Rico Senate is a constituent part of the Commonwealth government, created by the Puerto Rico Constitution. See P.R. CONST. art. III, § 1. Its members are thus part of the limited category of government officials who represent the "State" as a whole, unlike employees of localities or of agencies at every level of government. As such, they easily fall within the concept

of "an agent of . . . a State . . . government." Martínez and de Castro Font were thus properly considered agents of the Commonwealth of Puerto Rico under § 666.

*Id.* at 9.

Though Fernandez dealt with elected senators rather than officers or employees of the Puerto Rico Senate, the Court finds the case persuasive. The status of the defendant senator as a senator was the manner in which the First Circuit established his status as an "agent". *Fernandez*, 722 F.3d at 8 ("Indeed, the plain language of the statute includes a "representative" of a "government" in the list of positions that fall under the statute's definition of "agent," 18 U.S.C. § 666(d)(1), and there is no more classic government "representative" than a legislative branch officer.") The defendant's specific role as a senator did not, however, appear within the First Circuit's rationale for why an individual acting for the Puerto Rico Senate is thereby acting for the Commonwealth of Puerto Rico. *Id.* at 9.

 As in Puerto Rico, the Legislature of the Virgin Islands is a constituent and inseparable part of the Government. An individual with the capacity to act for the Legislature would thereby fall within "the limited category of government officials who represent the 'State' as a whole, unlike employees of localities or of agencies at every level of government." *Id.*

 Willis was "a person authorized to act on behalf of . . . a government" as a "servant or employee, . . . , director, officer, manager, and representative[.]" 18 U.S.C. § 666(d)(1). As such, he falls within the definition of agent in Section 666.

Willis also argues that the bribes involved in this case were not connected to business transactions of the agency or government which employed him. This argument seems to be premised on Willis's belief that limits "business transactions" to only the passage of legislation. This belief runs counter to what is commonly understood as included in the term "transaction."

The common definition of "transaction" is "something transacted; especially: an exchange or transfer of goods, services, or funds[.]" *See* Transaction, Webster's Third New International Dictionary (Merriam Webster 1993). A contract for the provision of construction, excavation, or air conditioner services would be well within that definition. Indeed, the Court cannot fathom a definition of the "business transactions of the

Government" which would exclude contracts entered into by the Government for the maintenance and construction of Government buildings.

Willis's view of a business transaction for Section 666 purposes also conflicts with the overwhelming body of caselaw. *See generally, e.g., United States v. Andrews*, 681 F.3d 509, 56 V.I. 1007 (3d Cir. 2012) (affirming conviction under Section 666 for accepting bribes in connection with the award of a government contract); *United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010) (affirming conviction of contractor who bribed local officials in order to secure sewage contracts); *United States v. Plaskett*, 50 V.I. 548 (D.V.I. 2008) (denying Rule 29 relief to agent of the Virgin Islands who accepted bribes in connection with government contracts).

The evidence, credited by the jury, established that Willis accepted money and other things of value in exchange for awarding contracts to renovate the Legislature. Such contracts clearly fall within the business transactions of the Government of the Virgin Islands.

 Willis also argues that the government failed to prove that he accepted something of value in connection with the business or transactions of the Virgin Islands involving anything of value of $5,000 or more. Willis correctly argues that the "value" that must be $5,000 or more is the value of the transactions the defendant seeks to influence. *See United States v. Duvall*, 846 F.2d 966, 976 (5th Cir. 1988) ("From simply reading the statute, it is clear that the $5000 figure qualifies the transactions or series of transactions that the recipient of the bribe carries out in exchange for receiving 'anything of value.' ").

The government adduced evidence in the form of invoices establishing the cost of the renovation contracts entered into by the Legislature and Williams and James respectively. Williams's contract involved over $20,000 of construction work. James's contract involved over $300,000 of work on the air conditioning system. Both of these amounts exceed the $5,000 threshold by a substantial amount.

Willis next contends that the fourth element of Section 666 was not proven by the government. Specifically, he asserts that the bribery alleged was not in connection with any federally funded program. Willis accepts that the Government of the Virgin Islands receives more than $10,000 each year in federal funds. He does not accept that the Legislature itself receives those funds. Willis's argument presumes that the Legislature is

somehow severable from the Government of the Virgin Islands and that Willis is only an agent of the former, not the latter. As discussed above, this premise is deeply flawed. As this Court has already found, Willis was an agent of the Government of the Virgin Islands.

There can be no dispute that the Government of the Virgin Islands received federal funds in excess of $10,000. Indeed, Debra Gottlieb, employed by the Office of Management and Budget for the Legislature, testified that each fiscal year the Government of the Virgin Islands received over 150 million dollars from the federal government. That is well in excess of the $10,000 threshold the government was obligated to meet.

Willis also asserts that there was no quid pro quo for either Count One or Count Three. As such, Willis argues, there could be no finding that the received benefit was bribery (or the result of extortion). Specifically, Willis argues that neither James nor Williams provided funds or things of value in exchange for services, based on the evidence adduced at trial.

Willis asserts that James did not state any reason whatsoever for giving Willis the $10,000 or providing air conditioning services for Willis's home. At no point did James testify specifically as to his intent in giving Willis money or free air conditioning assistance. Willis argues that the only evidence adduced was: (1) James gave Willis money; (2) because Willis asked for money.

Though these facts were adduced at trial, this recitation by Willis fails to state the context. James testified that he had entered a contract with Willis to do work for the Legislature renovation. While that contract was being performed, Willis began asking James for money and services. James stated that he and Willis were not friends, though they lived near each other, knew one another, and greeted one another when they passed the other. Finally, another government witness, Clifford Charleswell, testified that Willis had told Charleswell about receiving money from contractors during the Legislature renovation. It is against this backdrop that the jury considered whether or not there was evidence that James gave Willis the $10,000 and repaired Willis's air conditioning free of charge with some expectation of favorable treatment from Willis in Willis's professional capacity.

In *United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010), the contractor-defendants were accused of bribing public officials in violation of Section 666. *United States v. McNair*, 605 F.3d 1152, 1167 (11th Cir.

2010). The contractors asserted that the benefits that they had conveyed on the public officials were gifts. *Id.* at 1196. Despite these protestations, the contractors were convicted. *Id.* at 1174-75. The contractors sought Rule 29 relief. *Id.* at 1195 (considering sufficiency of the evidence).

The Eleventh Circuit found that "ample evidence" showed that the contractors had provided things of value to county employees for the purpose of bribing them. *Id.* at 1196.

> There was no evidence of gifts to these "friends" before the sewer projects began. Instead, the gifts to McNair and Swann and other County employees were made during the same time period of the sewer projects. . . . The jury was free to disbelieve the defendants' claims of gifts for friendship and to find corrupt intent to influence McNair and Swann in connection with the County's massive sewer payments to the contractor-defendants. The juries could readily believe the gifts worth hundreds of thousands of dollars to McNair and Swann after the sewer work began were actually bribes intended to make sure the contractors profited excessively from the work.

*McNair*, 605 F.3d at 1196.

Here, as in *McNair*, the jury heard testimony that James gave Willis substantial gifts: a new air conditioner, installation of that air conditioner, and $10,000. The testimony adduced indicated that James and Willis were not friends, and there was no evidence that James had ever given Willis such generous gifts before the Legislature renovation began. As such, the jury could reasonably have concluded that James's purpose in giving such gifts to Willis was related to the Legislature renovation.

With regard to Williams, Willis simply asserts that the government failed to establish any quid pro quo. This argument is unavailing. Williams testified that he gave Willis $3,000 in cash in order to ensure Willis would "look out for [Williams] down the road." (Nov. 18, 2014, Trial Tr. 71:20-21.) Williams testified that he hoped that Willis would consider using Williams's company for future work. (Id. 71:23-24.) Williams also stated that Willis told Williams that, "he does take care of his people, you know." (Nov. 18, 2014, Trial Tr. 68:23-24.) This is enough to allow the jury to infer that an exchange was intended. *See, e.g.*, McNair, 605 F.3d at 1188-89 ("To be sure, many § 666 bribery cases will involve an identifiable and particularized official act, but that is not

771

required to convict. . . . The intent that must be proven is an intent to corruptly influence or to be influenced "in connection with any business" or "transaction," not an intent to engage in any specific quid pro quo. In concluding § 666 does not require a specific quid pro quo, we align ourselves with the Sixth and Seventh Circuits.")

 Finally, Willis challenges the Constitutionality of Section 666 as applied to his behavior in this case. Specifically, he argues that applying Section 666 to conduct which used funds of indeterminate origin would violate the Spending Clause of the Constitution. The Supreme Court of the United States has already ruled on this issue and, contrary to Willis's assertions, the manner in which the Court did so does not leave room for Willis's challenge. In *Sabri v. United States*, 541 U.S. 600, 124 S. Ct. 1941, 158 L. Ed. 2d 891 (2004), the Supreme Court stated that

> It is true, just as *Sabri* says, that not every bribe or kickback offered or paid to agents of governments covered by § 666(b) will be traceably skimmed from specific federal payments, or show up in the guise of a quid pro quo for some dereliction in spending a federal grant. Cf. *Salinas v. United States*, 522 U.S. 52, 56-57, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997) (The "expansive, unqualified" language of the statute "does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)"). But this possibility portends no enforcement beyond the scope of federal interest, for the reason that corruption does not have to be that limited to affect the federal interest. Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value. Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there. And officials are not any the less threatening to the objects behind federal spending just because they may accept general retainers. See *Westfall v. United States*, 274 U.S. 256, 259, 47 S. Ct. 629, 71 L.Ed. 1036 (1927) (majority opinion by Holmes, J.) (upholding federal law criminalizing fraud on a state bank member of federal system, even where federal funds not directly implicated). It is certainly enough that the statutes condition the offense on a threshold amount of federal dollars defining the federal interest, such as that provided here.

*Sabri v. United States*, 541 U.S. 600, 605-06 (2004). A plain reading of the Court's statements in Sabri indicate that the Spending Clause is not violated

simply because some direct impact on federal funds cannot be proven. In light of that, this Court will not insist on such a showing here.[1]

### 2. Counts Two and Four: Hobbs Act Extortion

 The two essential elements of a Hobbs Act extortion claim under 18 U.S.C. § 1951, as alleged in the indictment are: extortion, defined as "the obtaining of property from another with his consent . . . under color of official right," 18 U.S.C. § 1951(b)(2); and that such extortion interferes with interstate commerce. *See United States v. Millet*, 123 F.3d 268, 272-73 (5th Cir. 1997); accord *United States v. Salvitti*, 464 F. Supp 611, 615 (E.D. Pa. 1979).

 Willis argues that the government failed to prove there was a quid pro quo. Specifically, he asserts that generalized influence is not sufficient to constitute an "official act" and thus there was no quid pro quo in this case under the Hobbs Act. This argument misunderstands what is necessary to show the quid pro quo of extortion in a Hobbs Act context.

> A public official commits extortion under color of official right under 18 U.S.C. § 1951(a) when the official promises to engage in an official act in exchange for a personal gift. *Evans v. United States*, 504 U.S. 255, 268, 112 S.Ct. 1881, 1889, 119 L.Ed.2d 57 (1992). Unless the "gift" is a campaign contribution, the quid pro quo between the public official and the gift giver can be implicit. *United States v. Antico*, 275 F.3d 245, 257 (3d Cir. 2001). Consequently, the official does not have specifically to promise anything in return, as long as all parties involved recognize that a gift is being given in exchange for official action. A wink and a nod is good enough. Also, the official does not have to promise to perform a specific action in exchange for a specific gift; instead, the official can accept a "stream of benefits" in exchange

---

[1] Willis also mentions, albeit without indicating how or why it fits within his motion for Rule 29 relief, that the Third Circuit model instructions include an optional instruction on "bona fide" expenses. See Third Circuit Model Criminal Instruction 6.18.666A1A-5. Willis does not assert that this Court erred in not including this instruction. Indeed, he does not even assert that any of the transactions were shown by any evidence to be "bona fide transactions." Additionally, Willis did not request that this instruction be included in the jury charge at any time. Finally, Willis does not request any relief as relates to the jury instructions. Considering these facts, the Court is disinclined to further consider Willis's brief mention of the optional model instructions.

for one or more official acts as though the official is on a retainer. See *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007).

*United States v. Donna*, 366 Fed. Appx. 441, 450 (3d Cir. 2010). As the Third Circuit Court of Appeals noted, it can be difficult to discern what is intended when the parties do not clearly express themselves. *Id.* at 450 n.7.

 In this case, Williams testified directly that he had given Willis money in order to induce Willis to give him more contracts with the Legislature. That is, Williams gave Willis property to which Willis was not otherwise entitled. That property was given to Willis in exchange for Willis, at some future time, doing an official act — binding the Legislature in contract. As to Williams, the quid pro quo is quite clear.

As in the Section 666 counts, James did not testify specifically to his intent. James failed to explain why he chose to give Willis $10,000 or free air conditioners and installation during the course of James's contract with the Legislature. As above, though, the evidence showed that James and Willis were not friends and there was no evidence that James had ever given Willis any kind of gift in the past. Giving all reasonable benefit of the doubt to the government, the jury could have reasonably inferred that such gifts were in exchange for some kind of consideration as related to James's contract. That is, something of value was exchanged for some manner of favorable treatment as related to an official act. As such, the government adequately proved the first element of extortion.

 Willis also argues that, as applied to the conduct at issue in this case, the Hobbs Act is unconstitutionally vague because it fails to put individuals on notice of what behavior is unlawful. "A statute is unconstitutionally vague if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute or encourages arbitrary and erratic arrests and convictions. A statute can be void for vagueness not only on its face, but as applied, as a result of 'an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *United States v. John-Baptiste*, 747 F.3d 186, 200, 60 V.I. 904 (3d Cir.) *cert. denied sub nom. Brooks v. United States*, 134 S. Ct. 2324, 189 L. Ed. 2d 199 (2014) and *cert. denied sub nom. Edwards v. United States*, 134 S. Ct. 2889, 189 L. Ed. 2d 837 (2014)(internal citations and quotations omitted).

 On its face, the Hobbs Act prohibits "obtaining property from another, with his consent . . . under color of official right." 18 U.S.C. § 1951(b)(2).

It is a familiar maxim that a statutory term is generally presumed to have its common-law meaning. As we have explained: Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them. At common law, extortion was an offense committed by a public official who took by colour of his office money that was not due to him for the performance of his official duties. A demand, or request, by the public official was not an element of the offense. Extortion by the public official was the rough equivalent of what we would now describe as taking a bribe.

*Evans v. United States*, 504 U.S. 255, 259-60, 112 S. Ct. 1881, 119 L. Ed. 2d 57 (1992) (internal citations and quotations omitted). The issue is thus whether this clear prohibition on the acceptance of things of value in exchange for official acts by government officials clearly prohibits the activities engaged in by Willis.

In *United States v. Williams*, 621 F.2d 123 (5th Cir. 1980), the Fifth Circuit was faced with the issue of whether the Hobbs Act was unconstitutionally vague as applied to a defendant who had accepted gratuities while serving the local government. See *United States v. Williams*, 621 F.2d 123, 125 (5th Cir. 1980). In determining if the Hobbs Act was unconstitutionally vague as applied, the Fifth Circuit found that

The evidence here showed that when defendant, a member of the school board, made his requests for money, the other parties were aware of his public office. One payor, Arthur Brandin, testified that if defendant had not been a school board member, he would not have given defendant $4000. The evidence demonstrated that defendant accepted the money and gratuities, knowing he was not entitled to them in the discharge of his lawful duties, and that payment was induced by his official position. Neither on its face nor as applied in this case is the Hobbs Act unconstitutionally vague.

*United States v. Williams*, 621 F.2d 123, 125-26 (5th Cir. 1980)

Willis states that the statute does not put individuals on notice that accepting gifts from government contractors while a government agent might be criminal. The Court need not decide whether this is true, however, as the disconnected receipt of gifts is not the behavior for which Willis was indicted and convicted. Instead, Willis was convicted of accepting money and other things of value in exchange for, and in connection with, the award of legislature contracts over which Willis had authority or some degree of control.

 The contractors who made payments to Willis either testified that they made such payments because of Willis's position with regard to their contracts, or offered testimony from which, taken in context, a jury could so infer. In any event, as applied in this case, the Hobbs Act is not unconstitutionally vague.

 The Hobbs Act makes clear that acceptance of anything of value, to which the beneficiary is not entitled, under color of official rights or in exchange for official acts is unlawful. The jury believed the testimony of James, Williams, and Charleswell and found that Willis accepted money and other things of value in connection with favorable treatment in entering future contracts. That behavior is clearly proscribed by the statute and, as such, the statute is not void for vagueness as applied.

Considering the law and the facts as discussed above, Rule 29 relief is not appropriate on any of Willis's counts of conviction.

## B. Rule 33

 Willis is required to show there is newly discovered evidence, or that there was reversible error at his trial, in order to be granted a new trial pursuant to Federal Rule of Criminal Procedure 33. "[A] district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted." *Davis*, 397 F.3d at 181 (internal quotation omitted). Further, the "burden is on the defendant to show that a new trial ought to be granted. Accordingly, the burden is on [the defendant] to show that his trial resulted in a miscarriage of justice." *United States v. Saldana*, Crim. No. 2009-32, 2010 U.S. Dist. LEXIS 79399 (D.V.I. Aug. 4, 2010) *aff'd*, 473 Fed. Appx. 118 (3d Cir. 2012)

In total, Willis argues five bases for a new trial. The Court will address each in turn.

### 1. Weight of the Evidence

 In his motion for new trial, Willis argues that there was a miscarriage of justice. In support of this argument, Willis simply reasserts the arguments he made in support of his Rule 29 motion discussed above. "[A] district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted." *Davis*, 397 F.3d at 181 (internal quotation omitted). The burden to show such a danger exists is on the defendant. *Saldana*, Crim. No. 2009-32, 2010 U.S. Dist. LEXIS 79399.

Willis's legal arguments that the evidence adduced fails to establish a quid pro quo for either count is as unavailing in this context as it was above. It certainly falls short of persuading the Court that an innocent person may have been convicted. Similarly, Willis's incorporated legal arguments from the remainder of his Rule 29 motion are also unavailing. Willis's mistaken belief that an individual that could act on behalf of the entirety of the Legislature is not an agent of the Government of the Virgin Islands is no more persuasive in this context than in that above. As such, the Court does not find that the weight of the evidence merits a new trial.

### 2. Admission of 404(b) Evidence

Willis contends that the Court erred in admitting evidence of a prior bad act and thereby violated Federal Rule of Evidence 404(b).

 Rule 404(b) limits the admission of evidence of a crime, wrong, or other act. See FED. R. EVID. 404(b). In fact, the Third Circuit has stated quite clearly that Rule 404(b) is generally a rule of exclusion. *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014) ("On this point, let us be clear: Rule 404(b) is a rule of general exclusion, and carries with it no presumption of admissibility.") In determining what prior acts may be admissible under Rule 404(b), the Third Circuit has stated

> Federal Rule of Evidence 404(b), which governs the admissibility of a defendant's prior bad acts, provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). The rule states,

777

however, that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2).

*United States v. Brown*, 765 F.3d 278, 291 (3d Cir. 2014).

To summarize, Rule 404(b) provides that prior act evidence is inadmissible unless the evidence is (1) offered for a proper non-propensity purpose that is at issue in the case; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested.

*Caldwell*, 760 F.3d at 277-78.

During trial, the government elicited testimony from Williams regarding uncharged conduct that took place approximately six years before the activities identified as criminal in the indictment. Specifically, Williams testified that in 2003, while director of the Virgin Islands Bureau of Internal Revenue, Willis had solicited a bribe from Williams in exchange for the release of a tax lien against Williams's business. Willis objected to the introduction of this evidence as violating Rule 404(b). The government asserted in response that the evidence demonstrated intent, motive, knowledge, and lack of mistake.

 To determine if this evidence was admissible, the Court first considers if it was offered for a non-propensity purpose that was at issue in the case. The government argued that the evidence went to intent, motive, knowledge, and lack of mistake. Intent or knowledge is an element of all six of the counts in the Indictment. See 18 U.S.C. § 666; 18 U.S.C. § 1951. Furthermore, evidence of motive and lack of mistake countered Willis's contentions that he understood the items of value given to him as loans or gifts, rather than as bribes. As such, there was a non-propensity purpose that was at issue in the case.

The Court next considers if the prior bad act was relevant to the identified purposes. The act of soliciting funds from an individual who sought an official act, and thereafter taking the sought-after act, is evidence of Willis's intent when he asked people seeking official actions for things of value. Such evidence is, of course, not dispositive on that issue, but it certainly is relevant on that point. Furthermore, the

introduction of evidence that Willis had received funds and thereafter undertaken an official act benefiting the payor tended to prove that Willis knew what subsequent payments from that same individual were meant to be. As such, the evidence was relevant to the proffered non-propensity purposes.

 The Court next considers if the evidence was unfairly prejudicial under Rule 403. When considering a Rule 403 issue, "the trial court should carefully weigh the probative value of the proffered testimony against its possible prejudicial effects." *Gov't of Virgin Islands v. Felix*, 569 F.2d 1274, 1280, 15 V.I. 490 (3d Cir. 1978). Rule 403 "does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case. Rather, the rule only protects against evidence that is unfairly prejudicial. Evidence is unfairly prejudicial only if it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Carter*, 617 F.2d at 972 (emphasis added).

Evidence of Willis's intent was certainly probative, as it went directly to one of the elements the government had to prove and which Willis most vigorously contested. Indeed, this evidence was some of the most probative on this point, as proving intent is extremely difficult in the absence of a defendant's testimony or confession, which the defendant is never obligated to give. The question before the Court is therefore whether there was so much prejudice occasioned by this testimony as to outweigh the evidence's probative value on this salient issue.

There is always a risk of undue prejudice when the government introduces a prior, identical (or nearly so) bad act in a case. First, there is the risk that the jury will use such evidence for a forbidden purpose — that is, that they will use it as propensity evidence. Second, where, as here, the bad act was uncharged, it runs the risk of creating a trial within a trial and confusing the issues the jury needs to consider.

Though there is risk in allowing a jury to hear 404(b) evidence because they may use it for some improper purpose, the Court notes that a limiting instruction was given and the Court presumes that its instructions to the jury are followed. Considering next the problem of confusing the jury with a mini-trial, the proposed evidence and rebuttal were not so in-depth and complicated so as to confuse a jury. Indeed, the record indicates that actual testimony about the lien and its removal involved only two

779

witnesses and a minimal number of documents. As such, there was no jury confusion such that might violate Rule 403.

Finally, the Court considers whether a limiting instruction was given, if requested. Indeed, here the Court did give a limiting instruction. Specifically, the Court instructed the jury that, as related to the evidence of the 2003 tax lien bribe, "[t]hat evidence of some other act was admitted only for a limited purpose. You may consider this evidence only for the purpose of deciding whether the defendant had the state of mind, knowledge or intent necessary to commit the crime charged in the indictment . . . . Do not consider this evidence for any other purpose." (Trial Tr., Nov. 19, 2014, 4:21-5:7.)

Considering each of these factors, as instructed by the Third Circuit, the Court finds that admission of the Rule 404(b) evidence in this matter was proper. As such, Willis is not entitled to a new trial on this basis.

### 3. Proposed Jury Instructions

██ Willis asserts, with no legal or factual support, that the Court failed to consider his proposed jury instructions. The only underpinning for this claim seems to be that the Court held its charging conference in chambers.

The Court first notes that it devotes due consideration to everything filed on the docket. In fact, Willis's proposed jury instructions were read and considered by the Court. Failure to include Willis's proposed instructions in the final draft of the jury instructions does not indicate whether or not such instructions were considered. The Court also notes that at no time did Willis object to the jury charge proposed by the Court. Indeed, even now Willis fails to identify anything in the Court's jury charge that was erroneous or to identify anything that was unlawfully omitted of which he sought inclusion. Finally, though Willis's counsel was well-aware of the Court's practice of conducting charging conferences in chambers, Willis did not object at any time to the holding of the charging conference in chambers.

Significantly, the parties are permitted as a matter of course to present, on the record, any objections to the Court's charge. (Policies and Procedures, III.P.1., http://www.vid.uscourts.gov/sites/vid/files/CVG_Policies_and_Procedures_4-24-14.pdf) No objections were lodged which could be preserved for review on this issue. Additionally, the Court is unaware of,

and Willis does not cite to, any factual or legal underpinning for his contention that holding the charging conference in chambers resulted in discounting Willis's proposed instructions. As such, Rule 33 relief is not merited by this claim.

### 4. Admission of Williams's Understanding of "Good Looking Out"

██ Willis also argues that the Court erred in admitting testimony from Williams regarding his understanding of the phrase "good looking out." Williams testified at trial that when he gave money to Willis, Willis replied with "good looking out." Williams testified that he understood that phrase to mean "I appreciate it" or "thank you."

> Under Federal Rule of Evidence 701, lay witnesses may state their understanding of the use of another person's statements "only if rationally based on the perception of a witness and helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue." *United States v. Cox*, 633 F.2d 871, 875 (9th Cir. 1980), *cert. denied*, 454 U.S. 844, 102 S. Ct. 159, 70 L. Ed. 2d 130 (1981).

*United States v. De Peri*, 778 F.2d 963, 977 (3d Cir. 1985). Such opinions are based on the witness's direct perception of the statement, and are not speculative. See id.

██ Here, Williams testified as to his direct perception of what was said and his personal understanding of what it meant. He did not speculate on what Willis in fact meant, and Williams's testimony was not based on anything other than what he personally observed. Furthermore, it served as evidence that Willis had received the monies Williams claimed to have paid to Willis. Indeed, Williams's testimony was the only evidence as to that payment and Willis's counsel contested that such a payment was ever made. As such, the testimony was helpful to the trier-of-fact in determining a fact at issue.

As Williams's testimony as to his understanding of the term "good looking out" fell within the ambit of Rule 701, it was properly admitted. Therefore, Willis is not entitled to a new trial on the basis of Williams's testimony.

781

### 5. Defendant's Confrontation Rights

Finally, Willis contends that his Constitutional right to confront witnesses and to present a defense was infringed upon. Specifically, Willis takes issue with the Court's limiting of his cross-examination of James. During cross-examination, Willis sought to elicit testimony and introduce evidence that James had violated tax laws of the Virgin Islands and faced potential liability for those actions. Willis asserts that this testimony was relevant to establish an agreement James had entered with the government.

The Court first notes that Willis was allowed to inquire as to James's agreement with the government. Indeed, at trial, the following colloquy occurred:

> Q: And you're testifying today under an immunity agreement, correct?
> A: I really don't know what would happen.
> Q: Well, you have an agreement with the government where if you testify, they will not, they will not use whatever you testify against you?
> MR. WEITZ: Objection, Your Honor. That's not the agreement.
> COURT: Overruled.
> THE WITNESS: The only agreement I have is to come here and speak the truth.
> MR. CEVALLOS: Fair enough.
> Q: You did not first approach federal agents. They approached you, correct?
> A: Yes.
> Q: At some point they sat you down and told you you might be in trouble; isn't that right?
> A: Not in that word — terms.

(Trial. Tr., Nov. 17, 2014, 292:1-19.) Shortly thereafter, Willis's counsel sought to inquire as to whether James had previously been paid "under the table" for unrelated work or paid taxes on those funds. At sidebar, Willis's counsel asserted that such inquiries went to James's credibility and James's deal with the government.

▮ Federal Rule of Evidence 608 states that

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in

> order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of [ ] the witness[.]

FED. R. EVID. 608. Here, the testimony that Willis's counsel sought to elicit addressed a prior specific instance of James's conduct. Though such instances may be the subject of cross-examination when they go to the witness's character for truthfulness, there is no indication here that the line of inquiry Willis proposed would go to James's character for truthfulness. As such, it would appear impermissible under Rule 608.

█ Moreover, Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Evidence of bias is always relevant. *See United States v. Green*, 617 F.3d 233, 251 (3d Cir. 2010). Where such evidence's probative value is outweighed by the threat of prejudice, however, the Court may prevent the introduction of that testimony. *See United States v. Maynard*, 476 F.2d 1170, 1174-75, 155 U.S. App. D.C. 223 (D.C. Cir. 1973).

█ In considering if the testimony Willis sought to adduce violated Rule 403, the Court first notes that the probative value of the sought testimony was minimal. Indeed, there was already evidence on the record that James had some manner of agreement with the government. Though the specifics were unknown, the testimony allowed the jury to infer some level of bias. Where, as here, counsel seeks to elicit testimony that a witness has engaged in something illegal, there is the prejudicial danger that "the witness will be disbelieved because he is a 'bad man,' even though the proof does not contain the showing of a conviction that is necessary for an attack on general veracity." *United States v. Robinson*, 530 F.2d 1076, 1081 (D.C. Cir. 1976). Additionally, as this was an alleged criminal act, introduction of evidence regarding whether any crime had been committed ran the risk of creating a trial within a trial. Such a situation would create undue confusion, delay, and a waste of time. *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1346 (3d Cir. 2002)(stating that "a trial within a trial" would have created the potential risk of undue delay and waste of time and, weighed against evidence of low probative

value, merited exclusion under Rule 403). Given the minimal probative value of the testimony Willis sought, and the danger of allowing such testimony in, Rule 403 barred introduction of such evidence here.

Though Willis argues that curtailing this specific line of questioning violated his confrontation rights, because such testimony went to James's deal with the government, this is untrue. Willis was permitted to question James regarding his deal with the government, and exercised that right. To the extent Willis believed that James was misstating the content of his deal, Willis was welcome to impeach James by asking him specific questions about that agreement. Getting into the specifics of the underlying conduct in the manner Willis's counsel attempted was not necessary to that inquiry and would have violated Rule 403.

As such, the Court finds that Willis is not entitled to a new trial on this basis.

## IV. CONCLUSION

Upon consideration of the record and after consideration of the relevant law, the Court does not find that Rule 29 or Rule 33 relief is merited. An appropriate order follows.