# SABRI *v.* UNITED STATES

No. 03–44.   Argued March 3, 2004—Decided May 17, 2004

*Andrew S. Birrell* argued the cause for petitioner. With him on the briefs were *R. Travis Snider* and *Aaron D. Van Oort.*

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the brief were *Solicitor General Olson, Assistant Attorney General Wray, Jeffrey A. Lamken,* and *Jeffrey P. Singdahlsen.*\*

JUSTICE SOUTER delivered the opinion of the Court.

The question is whether 18 U. S. C. § 666(a)(2), proscribing bribery of state, local, and tribal officials of entities that receive at least $10,000 in federal funds, is a valid exercise of congressional authority under Article I of the Constitution. We hold that it is.

I

Petitioner Basim Omar Sabri is a real estate developer who proposed to build a hotel and retail structure in the city of Minneapolis. Sabri lacked confidence, however, in his ability to adapt to the lawful administration of licensing and zoning laws, and offered three separate bribes to a city councilman, Brian Herron, according to the grand jury indictment that gave rise to this case. At the time the bribes were allegedly offered (between July 2 and July 17, 2001), Herron served as a member of the Board of Commissioners of the Minneapolis Community Development Agency (MCDA), a public body created by the city council to fund housing and

---

*Briefs of *amici curiae* urging reversal were filed for the Cato Institute by *Gary Lawson, Robert A. Levy,* and *Timothy Lynch;* and for the National Association of Criminal Defense Lawyers by *Joshua L. Dratel, Richard A. Greenberg,* and *Richard W. Garnett.*

economic development within the city. App. to Pet. for Cert. A–64 to A–65.

Count 1 of the indictment charged Sabri with offering a $5,000 kickback for obtaining various regulatory approvals, *ibid.*, and according to Count 2, Sabri offered Herron a $10,000 bribe to set up and attend a meeting with owners of land near the site Sabri had in mind, at which Herron would threaten to use the city's eminent domain authority to seize their property if they were troublesome to Sabri, *id.*, at A–65 to A–66. Count 3 alleged that Sabri offered Herron a commission of 10% on some $800,000 in community economic development grants that Sabri sought from the city, the MCDA, and other sources. *Id.*, at A–66.

The charges were brought under 18 U. S. C. § 666(a)(2), which imposes federal criminal penalties on anyone who

> "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more."

For criminal liability to lie, the statute requires that

> "the organization, government, or agency receiv[e], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." § 666(b).

In 2001, the City Council of Minneapolis administered about $29 million in federal funds paid to the city, and in the same period, the MCDA received some $23 million of federal money. App. to Pet. for Cert. A–63.

Before trial, Sabri moved to dismiss the indictment on the ground that § 666(a)(2) is unconstitutional on its face for failure to require proof of a connection between the federal

funds and the alleged bribe, as an element of liability. App. A-4. The Government responded that "even if an additional nexus between the bribery conduct and the federal funds is required, the evidence in this case will easily meet such a standard" because Sabri's alleged actions related to federal dollars. *Id.*, at A-6. Although Sabri did not contradict this factual claim, the District Court agreed with him that the law was facially invalid. A divided panel of the Eighth Circuit reversed, holding that there was nothing fatal in the absence of an express requirement to prove some connection between a given bribe and federally pedigreed dollars, and that the statute was constitutional under the Necessary and Proper Clause in serving the objects of the congressional spending power. 326 F. 3d 937 (2003). Judge Bye dissented out of concern about the implications of the law for dual sovereignty. *Id.*, at 953–957.

We granted certiorari, 540 U. S. 944 (2003), to resolve a split among the Courts of Appeals over the need to require connection between forbidden conduct and federal funds; compare, *e. g.*, *United States* v. *Grossi*, 143 F. 3d 348 (CA7 1998) (no nexus requirement), and *United States* v. *Lipscomb*, 299 F. 3d 303 (CA5 2002) (same), with *United States* v. *Zwick*, 199 F. 3d 672 (CA3 1999) (nexus requirement), and *United States* v. *Santopietro*, 166 F. 3d 88 (CA2 1999) (same). We now affirm.

## II

Sabri raises what he calls a facial challenge to § 666(a)(2): the law can never be applied constitutionally because it fails to require proof of any connection between a bribe or kickback and some federal money. It is fatal, as he sees it, that the statute does not make the link an element of the crime, to be charged in the indictment and demonstrated beyond a reasonable doubt. Thus, Sabri claims his attack meets the demanding standard set out in *United States* v. *Salerno*, 481 U. S. 739, 745 (1987), since he says no prosecution can satisfy the Constitution under this statute, owing to its failure to

require proof that its particular application falls within Congress's jurisdiction to legislate. See Tr. of Oral Arg. 12 ("This statute cannot be properly applied in any case").

We can readily dispose of this position that, to qualify as a valid exercise of Article I power, the statute must require proof of connection with federal money as an element of the offense. We simply do not presume the unconstitutionality of federal criminal statutes lacking explicit provision of a jurisdictional hook, and there is no occasion even to consider the need for such a requirement where there is no reason to suspect that enforcement of a criminal statute would extend beyond a legitimate interest cognizable under Article I, §8.

Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, Art. I, §8, cl. 1, and it has corresponding authority under the Necessary and Proper Clause, Art. I, §8, cl. 18, to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars. See generally *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819) (establishing review for means-ends rationality under the Necessary and Proper Clause). See also *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 276 (1981) (same); *Hanna* v. *Plumer,* 380 U. S. 460, 472 (1965) (same). Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity. See, *e. g., McCulloch, supra,* at 417 (power to "'establish post-offices and post-roads'" entails authority to "punish those who steal letters"). Section 666(a)(2) addresses the problem at the sources of bribes, by rational means, to safeguard the integrity of the state, local, and tribal recipients of federal dollars.

It is true, just as Sabri says, that not every bribe or kickback offered or paid to agents of governments covered by §666(b) will be traceably skimmed from specific federal pay-

ments, or show up in the guise of a *quid pro quo* for some dereliction in spending a federal grant. Cf. *Salinas* v. *United States,* 522 U. S. 52, 56–57 (1997) (The "expansive, unqualified" language of the statute "does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)"). But this possibility portends no enforcement beyond the scope of federal interest, for the reason that corruption does not have to be that limited to affect the federal interest. Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value. Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there. And officials are not any the less threatening to the objects behind federal spending just because they may accept general retainers. See *Westfall* v. *United States,* 274 U. S. 256, 259 (1927) (majority opinion by Holmes, J.) (upholding federal law criminalizing fraud on a state bank member of federal system, even where federal funds not directly implicated). It is certainly enough that the statutes condition the offense on a threshold amount of federal dollars defining the federal interest, such as that provided here.

For those of us who accept help from legislative history, it is worth noting that the legislative record confirms that § 666(a)(2) is an instance of necessary and proper legislation. The design was generally to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," see S. Rep. No. 98–225, p. 370 (1983), in contrast to prior federal law affording only two limited opportunities to prosecute such threats to the federal interest: 18 U. S. C. § 641, the federal theft statute, and § 201, the federal bribery law. Those laws had proven inadequate to the task. The former went only to outright theft of unadulterated federal funds, and prior to this Court's opinion in *Dixson* v. *United States,* 465 U. S. 482 (1984), which came after passage of § 666, the brib-

ery statute had been interpreted by lower courts to bar prosecution of bribes directed at state and local officials. See, *e. g., United States* v. *Del Toro,* 513 F. 2d 656, 661–663 (CA2 1975) (overturning federal bribery conviction); see generally *Salinas,* 522 U. S., at 58–59 (recounting the limitations of the pre-existing statutory framework). Thus we said that § 666 "was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds," *id.,* at 58, thereby filling the regulatory gaps. Congress's decision to enact § 666 only after other legislation had failed to protect federal interests is further indication that it was acting within the ambit of the Necessary and Proper Clause.

Petitioner presses two more particular arguments against the constitutionality of § 666(a)(2), neither of which helps him. First, he says that § 666 is all of a piece with the legislation that a majority of this Court held to exceed Congress's authority under the Commerce Clause in *United States* v. *Lopez,* 514 U. S. 549 (1995), and *United States* v. *Morrison,* 529 U. S. 598 (2000). But these precedents do not control here. In *Lopez* and *Morrison,* the Court struck down federal statutes regulating gun possession near schools and gender-motivated violence, respectively, because it found the effects of those activities on interstate commerce insufficiently robust. The Court emphasized the noneconomic nature of the regulated conduct, commenting on the law at issue in *Lopez,* for example, "that by its terms [it] has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 U. S., at 561. The Court rejected the Government's contentions that the gun law was valid Commerce Clause legislation because guns near schools ultimately bore on social prosperity and productivity, reasoning that on that logic, Commerce Clause authority would effectively know no limit. Cf. *Morrison, supra,* at 615–616 (rejecting comparable congressional justification for Violence Against Women Act of

1994).  In order to uphold the legislation, the Court concluded, it would be necessary "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U. S., at 567.

No piling is needed here to show that Congress was within its prerogative to protect spending objects from the menace of local administrators on the take.  The power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with congressional authority to spend in the first place, and Sabri would be hard pressed to claim, in the words of the *Lopez* Court, that § 666(a)(2) "has nothing to do with" the congressional spending power.  *Id.*, at 561.

Sabri next argues that § 666(a)(2) amounts to an unduly coercive, and impermissibly sweeping, condition on the grant of federal funds as judged under the criterion applied in *South Dakota* v. *Dole*, 483 U. S. 203 (1987).  This is not so.  Section 666(a)(2) is authority to bring federal power to bear directly on individuals who convert public spending into unearned private gain, not a means for bringing federal economic might to bear on a State's own choices of public policy.*

## III

We add an afterword on Sabri's technique for challenging his indictment by facial attack on the underlying statute, and begin by recalling that facial challenges are best when infrequent.  See, *e. g., United States* v. *Raines*, 362 U. S. 17, 22 (1960) (laws should not be invalidated by "reference to hypothetical cases"); *Yazoo & Mississippi Valley R. Co.* v. *Jackson Vinegar Co.*, 226 U. S. 217, 219–220 (1912) (same).  Al-

---

*In enacting § 666, Congress addressed a legitimate federal concern by licensing federal prosecution in an area historically of state concern.  In upholding the constitutionality of the law, we mean to express no view as to its soundness as a policy matter.

though passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks. Facial adjudication carries too much promise of "premature interpretatio[n] of statutes" on the basis of factually barebones records. *Raines, supra,* at 22.

As exemplified here, facial challenge can carry a further risk that a skeptical approach by district courts may avoid. Sabri was able to call his challenge a facial one in the strictest sense of saying that no application of the statute could be constitutional, only by claiming that proof of the congressional jurisdictional basis must be an element of the statute, a position that is of course not generally true at all. If that particular claim had been peeled away, it would have been obvious that the acts charged against Sabri himself were well within the limits of legitimate congressional concern. It would have been correspondingly clear that if Sabri was making any substantive constitutional claim, it had to be seen as an overbreadth challenge; the most he could say was that the statute could not be enforced against him, because it could not be enforced against someone else whose behavior would be outside the scope of Congress's Article I authority to legislate.

Facial challenges of this sort are especially to be discouraged. Not only do they invite judgments on fact-poor records, but they entail a further departure from the norms of adjudication in federal courts: overbreadth challenges call for relaxing familiar requirements of standing, to allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand. See, *e. g., Chicago* v. *Morales,* 527 U. S. 41, 55–56, n. 22 (1999) (plurality opinion). Accordingly, we have recognized the validity of facial attacks alleging overbreadth (though not necessarily using that term) in relatively few settings, and, generally, on the strength of specific reasons

weighty enough to overcome our well-founded reticence. See, *e. g., Broadrick* v. *Oklahoma,* 413 U. S. 601 (1973) (free speech); *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964) (right to travel); *Stenberg* v. *Carhart,* 530 U. S. 914, 938–946 (2000) (abortion); *City of Boerne* v. *Flores,* 521 U. S. 507, 532–535 (1997) (legislation under § 5 of the Fourteenth Amendment). See generally Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1351 (2000) (emphasizing role of various doctrinal tests in determining viability of facial attack); Monaghan, Overbreadth, 1981 S. Ct. Rev. 1, 24 (observing that overbreadth is a function of substantive First Amendment law). Outside these limited settings, and absent a good reason, we do not extend an invitation to bring overbreadth claims.

## IV

We remand for proceedings consistent with this opinion. The judgment of the Court of Appeals for the Eighth Circuit is

*Affirmed.*

JUSTICE KENNEDY, with whom JUSTICE SCALIA joins, concurring in part.

I join all but Part III of the Court's opinion. I do not join Part III but do make this comment with reference to it. The Court in Part III does not specifically question the practice we have followed in cases such as *United States* v. *Lopez,* 514 U. S. 549 (1995), and *United States* v. *Morrison,* 529 U. S. 598 (2000). In those instances the Court did resolve the basic question whether Congress, in enacting the statutes challenged there, had exceeded its legislative power under the Constitution.

JUSTICE THOMAS, concurring in the judgment.

Title 18 U. S. C. § 666(a)(2) is a valid exercise of Congress' power to regulate commerce, at least under this Court's

precedent. Cf. *Perez* v. *United States*, 402 U. S. 146, 154 (1971). I continue to doubt that we have correctly interpreted the Commerce Clause. See *United States* v. *Morrison*, 529 U. S. 598, 627 (2000) (THOMAS, J., concurring); *United States* v. *Lopez*, 514 U. S. 549, 584–585 (1995) (THOMAS, J., concurring). But until this Court reconsiders its precedents, and because neither party requests us to do so here, our prior case law controls the outcome of this case.

I write further because I find questionable the scope the Court gives to the Necessary and Proper Clause as applied to Congress' authority to spend. In particular, the Court appears to hold that the Necessary and Proper Clause authorizes the exercise of any power that is no more than a "rational means" to effectuate one of Congress' enumerated powers. *Ante*, at 605. This conclusion derives from the Court's characterization of the seminal case *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), as having established a "means-ends rationality" test, *ante*, at 605, a characterization that I am not certain is correct.

In *McCulloch*, the Court faced the question whether the United States had the power to incorporate a national bank. The Court was forced to navigate between the one extreme of the "absolute necessity" construction advocated by the State of Maryland, 4 Wheat., at 387 (argument of counsel), which would "clog and embarrass" the execution of the enumerated powers "by withholding the most appropriate means" for its execution, *id.*, at 408, and the other extreme, an interpretation that would destroy the Framers' purpose of establishing a National Government of limited and enumerated powers, see *id.*, at 423; cf. *Gibbons* v. *Ogden*, 9 Wheat. 1, 194–195 (1824). The Court, speaking through Chief Justice Marshall, carefully and effectively refuted Maryland's proposed "absolute necessity" test. "It must have been the intention of those who gave these powers, to insure, as far as human prudence could insure, their beneficial execution," the Court stated; "[t]his could not be done

by confiding the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate, and which were conducive to the end." *Mc-Culloch*, 4 Wheat., at 415. The Court opined that it would render the Constitution "a splendid bauble" if "the right to legislate on that vast mass of incidental powers which must be involved in the constitution" were not within the power of Congress. *Id.*, at 421.

But the Court did not then conclude that the Necessary and Proper Clause gives unrestricted power to the Federal Government. See *ibid.* ("[T]he powers of the government are limited, and . . . its limits are not to be transcended"). Rather, it set forth the following test:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Ibid.*[1]

"[A]ppropriate" and "plainly adapted" are hardly synonymous with "means-end rationality." Indeed, "plain" means "evident to the mind or senses: OBVIOUS," "CLEAR," and "characterized by simplicity: not complicated." Webster's Ninth New Collegiate Dictionary 898 (1991); see also N. Webster, American Dictionary of the English Language (1828) (facsimile edition) (defining "plainly" as "[i]n a manner to be easily seen or comprehended," and "[e]vidently; clearly; not obscurely"). A statute can have a "rational" connection to an enumerated power without being obviously or clearly tied to that enumerated power. To show that a statute is

---

[1] We have recently used a very similar formulation in describing the appropriate test under the Necessary and Proper Clause. In *Jinks* v. *Richland County*, 538 U. S. 456 (2003), we upheld the constitutionality of 28 U. S. C. § 1367(d) only after carefully concluding that the statute was both "conducive to" Congress' "power to constitute Tribunals inferior to the supreme Court," and also "plainly adapted" to that end. 538 U. S., at 462, 464 (internal quotation marks omitted).

"plainly adapted" to a legitimate end, then, one must seemingly show more than that a particular statute is a "rational means," *ante*, at 605, to safeguard that end; rather, it would seem necessary to show some obvious, simple, and direct relation between the statute and the enumerated power. Cf. 8 Writings of James Madison 448 (G. Hunt ed. 1908).

Under the *McCulloch* formulation, I have doubts that § 666(a)(2) is a proper use of the Necessary and Proper Clause as applied to Congress' power to spend. Section 666 states that, for any "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program," § 666(b), any person who

> "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of [such] organization or of [such] State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more," § 666(a)(2),

commits a federal crime. All that is necessary for § 666(a)(2) to apply is that the organization, government, or agency in question receives more than $10,000 in federal benefits of any kind, and that an agent of the entity is bribed regarding a substantial transaction of that entity. No connection whatsoever between the corrupt transaction and the federal benefits need be shown.

The Court does a not-wholly-unconvincing job of tying the broad scope of § 666(a)(2) to a federal interest in federal funds and programs. See *ante*, at 605–606. But simply noting that "[m]oney is fungible," *ante*, at 606, for instance, does not explain how there could be any federal interest in "prosecut[ing] a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $10,000,"

*United States* v. *Santopietro,* 166 F. 3d 88, 93 (CA2 1999). It would be difficult to describe the chain of inferences and assumptions in which the Court would have to indulge to connect such a bribe to a federal interest in any federal funds or programs as being "plainly adapted" to their protection. And, this is just one example of many in which any federal interest in protecting federal funds is equally attenuated, and yet the bribe is covered by the expansive language of § 666(a)(2). Overall, then, § 666(a)(2) appears to be no more plainly adapted to protecting federal funds or federally funded programs than a hypothetical federal statute criminalizing fraud of any kind perpetrated on any individual who happens to receive federal welfare benefits.[2]

Because I would decide this case on the Court's Commerce Clause jurisprudence, I do not ultimately decide whether Congress' power to spend combined with the Necessary and Proper Clause could authorize the enactment of § 666(a)(2). But regardless of the particular outcome of this case under the correct test, the Court's approach seems to greatly and improperly expand the reach of Congress' power under the Necessary and Proper Clause. Accordingly, I concur in the judgment.

---

[2] Criminalizing the theft (by fraud or otherwise) or embezzlement of federal funds themselves fits comfortably within Congress' powers. See *United States* v. *Hall,* 98 U. S. 343 (1879) (embezzlement of a soldier's federal pension).