## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30758

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

VANDALE THOMAS,

> Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

January 30, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Eastern District of Louisiana

Before DAVIS, ELROD, and HIGGINSON, Circuit Judges.

PER CURIAM:

Defendant-Appellant Vandale Thomas was convicted of theft from a program receiving federal funds, money laundering, and payment structuring arising out of work he performed for the New Orleans Traffic Court. Thomas appeals his convictions and sentence. For the reasons stated below, we AFFIRM his convictions and sentence.

I.

Defendant-Appellant Thomas was a contractor for the New Orleans Traffic Court ("Traffic Court") who provided various accounting services for the

No. 15-30758

court.[1] At trial, the government presented evidence that Thomas overbilled the Traffic Court for his services, sometimes billing for over twenty-four hours of work in a single day. Thomas would bill for services he did not provide, bill at a rate in excess of his contracted hourly rate, and backdate transactions in an attempt to conceal his activities. Thomas processed his own invoices and issued checks to himself after obtaining the signature of either the Traffic Court's judicial administrator or one of the Traffic Court judges. Between 2008 and 2011, Thomas received between $600,000 and $800,000 for billed services that he did not provide. After a five-day jury trial, Thomas was convicted of three counts of theft from a program receiving federal funds under 18 U.S.C. § 666; three counts of money laundering under 18 U.S.C. § 1957; and five counts of illegal payment structuring under 31 U.S.C. § 5324(a). The district court sentenced Thomas to three years of imprisonment. Thomas timely filed a notice of appeal.

II.

Thomas first argues that 18 U.S.C. § 666 should not have been applied to his conduct and that the evidence is insufficient to demonstrate that the elements of section 666 were met. Reviewing the sufficiency of the evidence, we ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cooper*, 714 F.3d 873, 880 (5th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We review *de novo* an interpretation of a federal statute. *United States v. Reyes*, 239 F.3d 722, 733 (5th Cir. 2001).

Section 666 makes it a crime for an agent of a state or local government or agency to embezzle, steal, obtain by fraud, or otherwise without authority

---

[1] We present the facts in the light most favorable to the conviction, as we must. *See United States v. Thomas*, 690 F.3d 358, 366 (5th Cir. 2012).

2

knowingly convert to his own use property that is worth $5,000 or more that is owned or under the care, custody, or control of that government or agency if that government or agency "receives, in any one year period, benefits in excess of $10,000 under [a] Federal program." 18 U.S.C. § 666(a)–(b); *see also United States v. Smith*, 804 F.3d 724, 728 (5th Cir. 2015). As properly instructed to the jury using this Circuit's pattern jury instructions, the elements of section 666 are: (1) Thomas was an agent of the City of New Orleans; (2) the City of New Orleans was a local government that received in any one-year period, benefits in excess of $10,000 under a Federal program; (3) Thomas knowingly embezzled, stole, obtained by fraud, or converted to the use of any person other than the rightful owner without authority, property that was owned by or under the care or control of the City of New Orleans or an agency thereof; and (4) the property had a value of $5,000 or more. *See United States v. Phillips*, 219 F.3d 404, 409 (5th Cir. 2000) (applying the same elements).

As this court has previously observed, the definition of "agent" under the first element of section 666 is broad. *Id.* at 411; *see also United States v. Harris*, 296 F. App'x 402, 404 (5th Cir. 2008) (unpublished) (noting that section 666 "defines agent very broadly"). Further, "the funds in question need not be purely federal, nor must the conduct in question have a direct effect on the federal funds. The statute possibly can reach misuse of virtually all funds of an agency that administers the federal program in question." *Phillips*, 219 F.3d at 411. However, our understanding of the statute's reach must account for "how organizationally removed the employee is from the particular agency that administers the federal program." *Id.* In *United States v. Phillips*, we cautioned that the term agent "should not be given the broadest possible meaning . . . but instead should be construed in the context of § 666 to tie the agency relationship to the authority that a defendant has with respect to control and expenditure of the funds of an entity that receives federal monies." *Id.* at 415.

3

In other words, the question of whether a defendant qualifies as an agent "within the meaning of section 666 turns on whether [the defendant] was authorized to act on behalf of [the entity receiving federal monies] with respect to its funds." *Id.* at 411. After our decision in *Phillips*, the Supreme Court provided further clarification of section 666's statutory framework and highlighted the type of evidence that juries and courts should consider. In *Sabri v. United States*, the Court emphasized that the critical inquiry is the nexus between the criminal activity and *government entity receiving federal funds*, not the nexus between the criminal activity and *any particular federal funds*. 541 U.S. 600, 604–05 (2004).

The jury in this case was instructed using our pattern jury instructions, which incorporate these critical nuances and limiting principles. For example, they instruct the jury on the statutory definition of "agent" under section 666 and provide the jury with this court's narrowing "nexus" requirement that the alleged criminal conduct be sufficiently connected to the government entity receiving the federal funds: "It is not necessary to prove that the defendant's conduct directly affected the funds received by the agency under the Federal program. However, there must be some connection between the criminal conduct and the local government receiving the federal assistance." Additionally, the district court here made clear to the jury that the government's theory of prosecution was that:

> the Traffic Court of New Orleans is a department of the City of New Orleans, and that Mr. Thomas, being the Chief Financial Officer of the Traffic Court, was an agent of the City of New Orleans because Mr. Thomas was authorized to act on behalf of the City of New Orleans with respect to its funds.

Neither party challenges the sufficiency of the district court's jury charges. "Because the jury was required to find that all of the elements of § 666(a)(1) were met in order to find [Thomas] guilty, we review the evidence in the light

most favorable to the Government as the prevailing party at trial." *Harris*, 296 F. App'x at 404.

The parties agree that the City of New Orleans received benefits in excess of $10,000 annually during the time period at issue and that the misappropriated funds had a value of $5,000 or more. However, Thomas argues that his conviction should be vacated because there was insufficient evidence to support the jury's verdict that he was an "agent" of the City of New Orleans within the meaning of section 666; in other words, Thomas argues that there was an insufficient connection between his criminal conduct and the local government receiving federal assistance.

We stress the importance that the government meet its burden of proving that this critical federal nexus exists. *See Phillips*, 219 F.3d at 413–14 ("[A]lthough the conduct prohibited by section 666 need not actually affect the federal funds received by the agency, *there must be some nexus between the criminal conduct and the agency receiving federal assistance*.") (emphasis in original) (quoting *United States v. Moeller*, 987 F.2d 1134, 1137 (5th Cir. 1993)); *cf. United States v. Izydore*, 167 F.3d 213, 220 (5th Cir. 1999) (reversing a wire fraud conviction because the government failed to provide sufficient evidence of the interstate nexus element, "an immutable requirement"). Without holding the government to its burden to prove the requisite federal nexus, we risk "turn[ing] almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance." *Fischer v. United States*, 529 U.S. 667, 681 (2000).

Regrettably, the government neglected to focus its brief on much of the trial record evidence supporting the nexus between Thomas's fraudulent activity and the government entity receiving federal funds—specifically the City of New Orleans. At oral argument, we entreated the government to point us to record evidence that Thomas had authority to act on behalf of the City of

## No. 15-30758

New Orleans with respect to the City's funds, but the government was unable to do so. Nevertheless, our own review of the record reveals sufficient evidence to support the jury's reasonable determination that Thomas was the City's "agent" under *Phillips* and that he had authority to act on behalf of the City with respect to the City's funds. We therefore conclude that the evidence presented to the jury, when viewed in the light most favorable to the government, was sufficient to support the verdict.

At the most general level, the jury heard not only direct witness testimony explicitly stating that the Traffic Court is a department of the City of New Orleans and that Thomas was an agent of both entities, but also supporting evidence demonstrating the close organizational connection between the City and its Traffic Court, as well as evidence showing that Thomas was authorized to act on behalf of both the City and the Traffic Court with respect to those entities' funds. Thomas oversaw and managed Traffic Court bank accounts, including accounts containing City funds, and had "full authority to make entries into the [accounting] system, to generate checks from the system, to reconcile the system, [and] to move funds, moneys across [accounts] in the system."

Despite this evidentiary record, Thomas urges that our decision in *Phillips* nonetheless forecloses a finding by the jury that he was an agent of the City of New Orleans under section 666. We disagree, not only because the jury was properly instructed on the law using our court's pattern jury instructions—which digest and incorporate our holding in *Phillips*—but also because the facts of *Phillips* are distinguishable.[2]

---

[2] Rather than distinguishing the facts of *Phillips*, the government instead urges us to view *Phillips* as "in tension" with our later decisions and decisions of other courts. But we have continued to rely on *Phillips* in the context of determining whether a defendant is an "agent" for the purposes of section 666 and note that *Phillips* is still good law. *See, e.g.*, *United States v. Whitfield*, 590 F.3d 325, 344 (5th Cir. 2009); *United States v. Shoemaker*, 746 F.3d

In *Phillips*, we held that a former tax assessor of St. Helena Parish, Louisiana, was not an "agent" of St. Helena Parish within the meaning of section 666. *Phillips*, 219 F.3d at 413. We based this determination in large part on the legal separation created by Louisiana law between the Tax Assessor's Office and the Parish, noting that "[t]he Louisiana Constitution, as well as statute, establish assessment districts as independent of parish government" and that "the activities of the assessor are supervised by the Louisiana Tax Commission, a state board controlled by state officials." *Id.* at 412; *see also Harris*, 296 F. App'x at 404 (distinguishing *Phillips* on the ground that the court in *Phillips* "ruled that the defendant . . . was not an agent of St. Helena Parish under § 666(d)(1), because Louisiana law *completely separated* the tax assessor's office from the parish government" (emphasis added)). We further observed that the Tax Assessor's Office had "a separate retirement system and health and life insurance benefits" and that, despite some statutorily-required support provided by the Parish, the Assessor's Office "is almost wholly self-funded by tax millage." *Id.* at 412. Importantly, there was "nothing in the record to indicate that [the tax assessor] had any ability to control or administer employees or programs or funds of the parish." *Id.* at 413. Despite this separation, the district court in *Phillips* provided the jury with the conclusory instruction that, "[u]nder Louisiana law, tax assessors are parish officers." *Phillips*, 219 F.3d at 410, 413. To the contrary, based on the facts of

---

614, 621–22 & n.7 (5th Cir. 2014) (applying the funds-based approach and then subsequently discussing the concerns presented in *United States v. Lipscomb*, 299 F.3d 303 (5th Cir. 2002), but noting that "*Phillips*'s narrower approach remains good law"); *United States v. Brown*, 727 F.3d 329, 338 (5th Cir. 2013) (noting that section 666 applies as long as "the government received the requisite federal funding and the agent involved 'was authorized to act on behalf of the [government] with respect to its funds'") (quoting *Phillips*, 219 F.3d at 411). As noted above, the jury instruction proposed by the government and given by the district court explicitly relied on *Phillips*'s definition of "agent." We have neither the authority nor the intention to disturb *Phillips*. Nor must we do so to uphold the jury's verdict here.

that case, we concluded that the tax assessor, "as a matter of law, was not an employee or officer of the parish" nor was he "authorized to act on behalf of the parish with respect to its funds." *Id*.

By contrast, the evidence presented in this case, taken in the light most favorable to the government, does not reveal an equivalent level of organizational divide between the City and the Traffic Court. In fact, the jury heard direct testimony that the "Traffic Court is part of New Orleans. It's a department within the City of New Orleans."[3] Witnesses further testified that the Traffic Court receives an appropriation from the City's General Fund each year, which ranged from $500,000 to over $900,000 annually during Thomas's tenure. To receive this appropriation, the Traffic Court is required to prepare a proposed budget, which it presents to the City Council each year for approval. In fact, as CFO, Thomas served as the Court's liaison to the City's budget office and prepared the Traffic Court's annual budget for presentation to and approval by the City Council. One witness also testified that the Traffic Court is unable to bring legal action on its own behalf in order to, for example, seek restitution for overbilled accounting fees. Instead, any legal action brought on behalf of the Traffic Court "would have to be instituted by the City of New Orleans." Further, the City has access to the Court's books and audits the Court's finances through the City of New Orleans Inspector General's Office, which, in fact, participated in the uncovering of Thomas's fraud during its 2011 audit of the Court.[4]

---

[3] Indeed, as one witness confirmed, the Traffic Court is listed as a department on the City's website, and the Court's letterhead lists it under the City of New Orleans.

[4] Similarly, when the Louisiana state agency charged with investigating the distribution of federal funds conducts audits to track the use of those funds by public entities throughout the state, "the financials of [the] Traffic Court are contained in the City of New Orleans's annual financial audit."

## No. 15-30758

Additionally, while the City shares responsibility under Louisiana law with the state for funding the Traffic Court judges' salaries, a state auditor testified that "the payroll for [the] Traffic Court is actually paid through the City of New Orleans." The government also elicited testimony that the City, unlike the parish in *Phillips*, coordinates Traffic Court employees' human resources and employment benefits, such as health insurance. The City also provides the Court's information-technology infrastructure, security, and phone systems. As one witness put it, "without the City of New Orleans, the Court could not function . . . on [its] own."

The jury also heard explicit testimony that as CFO, Thomas was both an agent of the Traffic Court and of the City, and the government put forward evidence showing that Thomas was authorized to act on behalf of both the City and the Traffic Court with respect to those entities' funds. The Court's current judicial administrator testified that Thomas had the "full spectrum of control in terms of [the Court's] financial accounting system."[5] For example, as the CFO, Thomas had "full authority to make entries into the [accounting] system, to generate checks from the system, to reconcile the system, [and] to move funds, moneys across [accounts] in the system." His written contract further authorized him to "[p]rovide any/all supervision to [the] Court's financial personnel in [the Court's] Accounting[,] Administrative[, and] Technology Departments." These supervised employees, who received health insurance benefits and human resource support from the City, understandably understood themselves to be City employees. Thomas himself was supervised by Traffic Court judges whose salaries were paid by the City and through the City's payroll.

---

[5] As the Court's current chief judge put it, Thomas was charged with the "overall management of our financial affairs, from soup to nuts."

No. 15-30758

Thomas makes much of the fact that "all of the money at issue in this case, whether earned or allegedly misappropriated, came out of the Judicial Expense Fund" (JEF), the Traffic Court's internal bank account, which it used to pay many of its own operational costs directly. The funds held in the Traffic Court's JEF account consist of revenues generated from fines, fees, and bond forfeitures that Thomas would transfer to the JEF from the Court's other four accounts. Prior to the formation of the JEF account, the Traffic Court deposited its revenues directly into the City's General Fund, and the Court's bills were paid directly from that central account. However, by the time Thomas was appointed CFO, state law had been amended to permit the Court to withhold a portion of collected fines, fees, and forfeited bonds and deposit those funds directly into an internal bank account to be used to defray a portion of the court's operational costs. Like many other Traffic Court employees, evidence at trial suggested that Thomas was paid for his accounting services through checks from the JEF account, rather than directly from the City's General Fund or from one of the Court's other four bank accounts. Based on this evidence, Thomas insists that he could not "exert control over any of the City's funds" and that "his activities were confined to the local funds that the Traffic Court generated and disbursed . . . ."[6]

---

[6] Thomas additionally argues that the existence of the JEF account itself demonstrates legal separation between the City and the Court of the kind we observed in *Phillips*. True, like other judicial subdivisions in Louisiana, the Traffic Court was permitted under state law to maintain the account and to withhold a portion of its generated fines, fees, and bonds revenue to defray operational costs, thus rendering the Court, at least to some degree, *less* dependent on appropriations from the City's General Fund and other forms of City support than it otherwise would be. However, as a Louisiana state auditor explained to the jury, the Traffic Court nonetheless is "still part of the City of New Orleans, but essentially, just [has] its own set of accounting records." Further, as discussed above, other evidence presented to the jury belies Thomas's urged understanding of the relationship between the two entities and readily distinguishes Thomas's case from *Phillips*.

No. 15-30758

As an initial matter, we read the Supreme Court's opinion in *Sabri* as cautioning against this type of fixation on the question of which precise funds have been mishandled or stolen, as opposed to the nexus between the criminal conduct and the government entity that receives the federal funds. Section 666 does not require "proof of connection with federal money as an element of the offense." *Sabri,* 541 U.S. at 606. And for good reason: "Money is fungible . . . . Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there." *Id.* at 606.[7]

However, even accepting the accuracy and relevance of Thomas's urged distinction between "City" funds and the so-called "Traffic Court" funds contained in the Court's JEF account, the jury's finding against Thomas's claim that he did not exert control over "any of the City's funds" is nonetheless supported by evidence presented by the government at trial. As multiple witnesses testified, Thomas had access to, controlled, and moved funds among all five of the Traffic Court's bank accounts: the Bond Forfeiture account, the Phone (or "IVR") account, the Internet (or "INET") account, the Fines and Fees (or "Escrow") account, and the Court's internal Judicial Expense Fund (JEF) account. Although Thomas was compensated from the JEF account, witnesses also testified that three of the other four accounts controlled by Thomas—the Fines and Fees account, the Internet account, and the Phone account—held City funds. Crucially—and an apt illustration of *Sabri*'s "liquidity" concept— Thomas had "full authority . . . to move funds . . . across" these accounts and, in fact, did move funds from these accounts to the JEF account from which he improperly siphoned money. For example, the Fines and Fees—or "Escrow"— account holds funds generated by traffic ticket revenue paid by defendants who

---

[7] Further, based on the extensive evidence that the "Traffic Court is part of New Orleans," it would seem that "Traffic Court" funds *are* "City" funds.

appear before the Court. This includes what one witness characterized as the "City's fine money," meaning the City's share of that traffic ticket revenue. As the person authorized to oversee the Fines and Fees account, Thomas was charged with determining how much money was to be transferred to the City from the Fines and Fees account each month. Thomas also transferred funds from the Fines and Fees account to the JEF account to cover various operational costs of the Court, including his own accounting fees. The jury additionally heard testimony that Thomas was authorized by the City's Chief Administrative Officer in the Mayor's Office to pay himself $150,000 out of City funds held in the Fines and Fees account as compensation for a portion of his accounting work. Checks introduced by the government suggest that Thomas paid himself using funds from the JEF account and then transferred City funds from the Fines and Fees account to the JEF account as reimbursement.

Thomas also managed City funds held in the Phone and Internet accounts (referred to at trial as the "IVR account" and the "INET account"), which the City set up to collect traffic fines and fees paid by defendants electronically through the City's website and by phone. One witness went so far as to describe the Internet account as "the City of New Orleans's bank account," rather than the Traffic Court's account. During his tenure at the Traffic Court, Thomas provided "accounting services to process, reconcile, review, and disburse funds" that had accumulated in these accounts, disbursing the funds to both the City and to the Traffic Court's internal JEF account. Thomas himself reported to Traffic Court judges that his reconciliation, review, and disbursement of funds from these accounts had resulted in a cumulative contribution of $3 million for the City's General Fund, evidence that Thomas was authorized to act on behalf of the City with respect to at least $3 million of its funds held in those two accounts alone. Based on this evidence, we find no merit to Thomas's contention that the jury could not

find that he was "authorized to act on behalf of [the City] with respect to its funds." *Phillips*, 219 F.3d at 411.

Above all, we reiterate that the jury in this case came to its verdict after having been properly instructed on the elements and nuances of section 666. This allowed the jury to assess and weigh the evidence before it using the precise legal framework provided by our pattern jury instructions, which benefit from and incorporate the limiting concepts we articulated in *Phillips*, as well as the more recent insight provided by the Supreme Court in *Sabri*. We thus conclude—as the district court did when faced with the same question post-verdict—that the evidence presented at trial, taken in the light most favorable to the government, was sufficient for a rational trier of fact to find that the elements of section 666 were met. Therefore, we cannot disturb the jury's verdict.

## III.

Alternatively, Thomas argues that if we were to construe section 666 so broadly as to encompass his conduct, the statute would be unconstitutional. We disagree. Thomas's argument rests on the assumption that there is no agency relationship between himself and the entity receiving federal funds, the City of New Orleans. However, as Thomas himself notes, this court has necessarily interpreted the term "agent"—an interpretation we apply here—in such a way as to avoid constitutional concerns of the type he raises. *United States v. Lipscomb*, 299 F.3d 303, 313 (5th Cir. 2002); *Phillips*, 219 F.3d at 414. Under this court's precedent, if there is a nexus between the criminal conduct and the agency receiving federal assistance (as distinct from the nexus between the misconduct and the federal funds themselves), the application of section 666 is constitutional. *Phillips*, 219 F.3d at 413–14 ("[A]lthough the conduct prohibited by section 666 need not actually affect the federal funds received by the agency, *there must be some nexus between the criminal conduct and the*

*agency receiving federal assistance.*" (quoting *Moeller*, 987 F.2d at 1137); *see also Sabri*, 541 U.S. at 604 (rejecting the argument that for application of section 666 to be constitutional there must be "proof of [a] connection between a bribe or kickback and some federal money"). The jury, having been properly instructed on this crucial requirement, found the existence of that nexus and concluded that Thomas was an agent of the City. Our own review of the evidentiary record confirms that finding. In sum, because we conclude that the evidence was sufficient to establish an agency relationship between Thomas and the entity receiving federal funds according to the statutory definition and the limiting principles described in *Phillips*, the application of section 666 to the unlawful conduct here is constitutional.[8]

## IV.

Thomas argues that the district court erred when it allowed portions of expert Paul Duplessis's testimony at trial. Duplessis was accepted by both parties as "an expert in money laundering and methods of concealing sources of income, including but not limited to transferring currency, structuring, and the use of cash to conceal transactions." Thomas failed to object to Duplessis's testimony at trial; therefore, we review the admission of Duplessis's testimony for plain error. *United States v. Cordova-Soto*, 804 F.3d 714, 722 (5th Cir. 2015). In reviewing for plain error, we use a four-prong approach: (1) there must be an error; (2) the error must be clear or obvious; (3) the error must

---

[8] Finally, Thomas argues that because various Traffic Court judges signed the checks he issued to himself, his conduct falls outside the scope of section 666. According to Thomas, section 666 requires that the alleged misconduct be carried out "without authority" and that the judges' signing of the checks demonstrates that all of his misconduct was done with the requisite authority. Thomas cites no caselaw for this proposition, and we find no basis for such an understanding in the text of the statute. Thomas further argues that if we vacate his section 666 theft convictions, his money laundering and payment structuring convictions must also be vacated. Because we do not vacate his section 666 theft convictions, we need not address this question.

affect the appellant's substantial rights; and (4) if the above prongs are satisfied, we have discretion to remedy the error "which ought to be exercised only if the error substantially affects the fairness, integrity or public reputation of the judicial proceedings." *United States v. Benitez*, 809 F.3d 243, 248–49 (5th Cir. 2015) (internal quotation marks and brackets omitted).

As we have recognized, "[t]he Federal Rules of Evidence circumscribe when an expert witness may testify with respect to a disputed matter at trial." *United States v. Ramos-Rodriguez*, 809 F.3d 817, 825 (5th Cir. 2016). Federal Rule of Evidence 702(a) "provides that an expert may testify if his scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotation marks omitted). "However, in a criminal case, an expert must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." *Id.* (quoting Fed. R. Evid. 704(b)) (internal quotation marks and brackets omitted). An expert may state an opinion even if it "embraces an ultimate issue." Fed. R. Evid. 704(b).

In his brief, Thomas argues that Duplessis opined improperly about Thomas's mental state. Thomas also complains generally about Duplessis's use of summary charts as well as Duplessis's testimony about the accuracy of the charts. Finally, Thomas argues that Duplessis improperly commented on the applicable law. We address each of these in turn.

First, Thomas contends that Duplessis's testimony improperly bore on Thomas's state of mind with respect to the structuring counts. At trial, Duplessis testified about Thomas's unusual transaction history, specifically regarding Thomas's multiple cash transactions that were just under $10,000. Duplessis testified that he considered whether Thomas's gambling habits were the reason for the numerous cash transactions, but determined that "there was

no pattern here of [Thomas] withdrawing cash, going to the casinos, losing cash and going back," thereby eliminating that as the reason for the transactions. Thomas argues that this was impermissible testimony regarding his state of mind. We disagree.

The only state-of-mind issues before the jury with respect to Thomas's structuring counts were: (1) whether Thomas knew of the financial institutions' legal obligation to report transactions over $10,000; and (2) whether Thomas knowingly structured or attempted to structure his transactions.[9] The testimony Thomas complains of does not directly address either of these elements, but rather it addresses whether Thomas's gambling could be an alternative explanation for the transactions in question. Because Duplessis's testimony did not directly speak to Thomas's mental state, Thomas has not demonstrated that the district court plainly erred in allowing the testimony. *See United States v. Dvorin*, 817 F.3d 438, 448 (5th Cir. 2016) (holding that the district court did not abuse its discretion in admitting testimony where the expert used the phrases "fraudulent checks," "fraud," and "conspiracy" but never directly commented on the defendant's state of mind).

Next, Thomas complains generally about Duplessis's use of, and reliance on, summary charts prepared by a legislative auditor following a two-year investigative audit of the Traffic Court. Thomas also complains that Duplessis improperly commented on the accuracy of the summary charts. While referencing the charts throughout his testimony, Duplessis testified that they

---

[9] The district court's jury instructions pertaining to the payment structuring counts contained the following elements:

(1) That the defendant knew of the domestic financial institution's legal obligation to report transactions in excess of $10,000;

(2) That the defendant knowingly structured or attempted to structure a currency transaction; and

(3) That the purpose of the structured transaction was to evade that reporting obligation.

contained "an accurate reflection" of the amount Thomas "was authorized to receive" through his contract with the Traffic Court. Thomas has not pointed us to any authority demonstrating that Duplessis's reference to or testimony regarding the charts was improper. Rule 702(b) requires that an expert's testimony be "based on sufficient facts or data," therefore, it was incumbent on Duplessis to review the extensive audit materials for accuracy before relying on them to conclude that Thomas received excess payments. Before testifying as to the charts' accuracy, Duplessis testified that he had reviewed all of the contracts relevant to Thomas as well as the documents prepared by the legislative auditor. Therefore, Duplessis's testimony as to the charts' accuracy was "based on sufficient facts or data." Fed. R. Evid. 702(b). Thomas has not demonstrated that the district court plainly erred in allowing Duplessis's testimony about the summary charts and their accuracy. *See* Fed. R. Evid. 702(b), 704(b).

Finally, Thomas argues that the district court plainly erred when it allowed Duplessis to testify about the law. With regard to the payment structuring count, Thomas specifically points to Duplessis's testimony that "[i]t doesn't matter whether or not the money is from illegal sources or legal sources. For a structuring violation to occur, it doesn't matter if it's legal or illegal money." Thomas argues that such testimony improperly allowed Duplessis to give his opinion on the legal conclusions to be drawn from the evidence. The government contends that this testimony served only to help the jury understand why Duplessis was not giving an opinion on the legality of the funds in contrast to his testimony regarding the money laundering counts.

We have held that Rule 704 "does not allow an expert to render conclusions of law." *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996); *see also Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). This rule and the other Federal Rules of Evidence "afford ample assurances against the

admission of opinions which would merely tell the jury what result to reach. . . .” *Salas v. Carpenter*, 980 F.2d 299, 305 n.4 (5th Cir. 1992); Fed. R. Evid. 704 advisory committee's notes (1972). While we do not believe this portion of Duplessis's testimony amounts to legal conclusions that tell the jury what result to reach with respect to a particular element of the structuring offense, the testimony does speak to what the law is. Even assuming *arguendo* that admitting this portion of Duplessis's testimony amounted to a clear or obvious error, Thomas has not shown that such an error affected his substantial rights. In general, “an error affects a defendant's substantial rights only if the error was prejudicial.” *United States v. Morin*, 627 F.3d 985, 994 (5th Cir. 2010). And an error is prejudicial only if “there is a reasonable probability that the result of the proceedings would have been different but for the error.” *Id.* Here, we do not believe Thomas was prejudiced by this portion of Duplessis's testimony because his testimony on this issue accurately stated the law,[10] and it was consistent with the jury instructions pertaining to the structuring counts. Moreover, the district court mitigated any potential prejudice by instructing the jury to judge Duplessis's testimony “like any other testimony,” and by reminding the jury in the middle of Duplessis's testimony that it was the court's responsibility, not the responsibility of any witness, to instruct them on the law.

---

[10] The payment structuring statute, 31 U.S.C. § 5324(a)(3), criminalizes “structur[ing] . . . any transaction with one or more domestic financial institutions” for the purpose of evading reporting requirements. Unlike money laundering, a conviction for structuring under section 5324 does not require a showing that the monetary transaction involved “criminally derived property” or “specified unlawful activity,” but can be based on structuring transactions involving legal funds. *Compare* 18 U.S.C. §§ 1956(a)(1) and 1957(a) (money laundering), *with* 31 U.S.C. § 5324(a)(3) (payment structuring); *United States v. Maduka*, 629 F. App'x 610, 612 (5th Cir. 2015) (“There is simply no requirement that the person's motivation for evading the federal reporting requirements be related to further criminal activity . . . .”)

No. 15-30758

In sum, none of the alleged errors pertaining to Duplessis's testimony of which Thomas complains "substantially affects the fairness, integrity or public reputation of the judicial proceedings" so as to justify the exercise of our discretion on plain error review. *Benitez*, 809 F.3d at 248–49. This is especially the case where, as here, the evidence against Thomas as to his payment structuring counts was overwhelming. *See United States v. Gutierrez-Farias*, 294 F.3d 657, 663–64 (5th Cir. 2002).

V.

Thomas next argues that the district court improperly admitted evidence under Federal Rule of Evidence 404(b). At trial, the government introduced evidence that from January 2006 through October 2008—the years immediately preceding the conduct at issue in his trial—Thomas submitted "inflated and duplicate invoices" to the Traffic Court. Thomas objected to the evidence on the basis that he was never charged for this conduct, but the district court ruled it was admissible under Rule 404(b) as it bore on Thomas's "intent, as well as any claim of mistake or accident."

We review the district court's admission of Rule 404(b) evidence over the defendant's objection for abuse of discretion. *United States v. Smith*, 804 F.3d 724, 735 (5th Cir. 2015). Evidence of an uncharged crime or other act "must be sufficient to support a finding that the crime or act actually occurred." *Id.* "If evidence of the crime or act is sufficient, its admissibility under Rule 404(b) hinges on whether (1) it is relevant to an issue other than the defendant's character, and (2) it possesses probative value that is not substantially outweighed by its undue prejudice under Federal Rule of Evidence 403." *Id.*

Here, Thomas does not dispute that the government presented evidence "sufficient to support a finding that the crime or act actually occurred." *See Smith*, 804 F.3d at 735. Further, the evidence was relevant to an issue other than Thomas's character as it "lessen[ed] the likelihood that [Thomas]

19

committed the charged offense with innocent intent." *Id.* at 736. Finally, the disputed evidence's probative value was not substantially outweighed by any undue prejudice under Rule 403. *Id.* The evidence of the uncharged offense "generate[d] sufficient probity" to meet Rule 403 as it occurred close in time to the charged offense and both instances showed Thomas overbilling his employer for large sums of money while acting in an auditing or accounting role. *See id.* In addition, the district court was careful to give the jury instructions pertaining to the proper use of the evidence. *Id.* Accordingly, the district court did not abuse its discretion by admitting the evidence under Rule 404(b). *Id.*; *see also United States v. Kinchen*, 729 F.3d 466, 474 (5th Cir. 2013).

VI.

Finally, Thomas claims that the district court violated his rights when it granted the government's reverse-*Batson* challenge[11] and empaneled a juror upon whom Thomas had exercised a preemptory strike. A "district court's determination that a party has used peremptory strikes in a discriminatory manner is a finding of fact and thus cannot be overturned by this Court absent clear error." *United States v. Bentley-Smith*, 2 F.3d 1368, 1372 (5th Cir. 1993). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985). The district court's decision is clear error "only if it is implausible in light of the record considered as a whole." *Brumfield v. Cain*, 808 F.3d 1041, 1057 (5th Cir. 2015).

---

[11] *Georgia v. McCollum*, 505 U.S. 42 (1992) held that *Batson v. Kentucky*, 476 U.S. 79 (1986) entitles prosecutors to make challenges to defense counsel's use of peremptory strikes. *McCollum*, 505 U.S. at 48; *see also Batson*, 476 U.S. at 89 (holding that the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race. . . .").

No. 15-30758

To make out a discrimination challenge, the party challenging the peremptory strike "must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005). Once the prima facie case is established, the burden shifts to the party who made the peremptory challenge to "explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes." *Id.* Finally, if a race-neutral explanation is tendered, the trial court must decide "whether the opponent of the strike has proved purposeful racial discrimination." *Id.*

During jury selection, Thomas's counsel used a peremptory challenge to strike Juror No. 27. The government objected to the peremptory challenge of Juror No. 27, arguing that the defense had sought to get rid of the juror merely because he was white. The government argued that there was a prima facie case that the defense had used all of its strikes on white prospective jurors. Defense counsel provided race-neutral reasons for why it struck each contested juror including the following two reasons for striking Juror No. 27: (1) the juror had been a claims adjuster and thus could possess relevant expertise that might render him predisposed against Thomas; and (2) the juror had previously served on a jury that found a defendant not guilty in a rape case. When the district court asked for further explanation with regard to the second reason, defense counsel explained: "it's very difficult for a juror to sit and find a defendant not guilty, they end up sometimes being ridiculed and so forth when they sit on a case and find a defendant not guilty, I would think the next time they sit on a jury they would have a tendency to be favoring the state, just been my experience over the years." The district court sustained the government's objection, explaining that the defense's asserted race-neutral reasons for striking Juror No. 27 were pretextual. Thomas contends it was

21

clear error for the district court to conclude that defenses counsel's reasons for striking Juror No. 27 were pretextual.

The Supreme Court has held that the trial court's decision about discriminatory intent "represents a finding of fact of the sort accorded great deference on appeal" because "[t]here will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez v. New York,* 500 U.S. 352, 364–65 (1991). Here, although the reasons proffered by defense counsel for striking Juror No. 27 were otherwise legitimate, the district court made an adverse credibility determination on those reasons. *See Woodward v. Epps*, 580 F.3d 318, 336 (5th Cir. 2009) (stating that a district court can base its determination about discriminatory intent "on the persuasiveness and credibility of the [party's] justification for his exercise of the peremptory strike"). While there may be differing opinions regarding whether or not the cold record suggests pretext, the district court heard the defense counsel and was in the best position to make credibility determinations. Therefore, we will not reverse those determinations. *See Brumfield*, 808 F.3d at 1057 (citing *Anderson*, 470 U.S. at 573–74).

## VII.

For the foregoing reasons, we AFFRIM Thomas's convictions and sentence.